William R. Bayes, Ch. J.
Appeal from judgment of the Magistrates’ Court of the City of New York, 7th District, Borough of Brooklyn, rendered January 23, 1941, convicting defendants of a violation of subdivision 2 of section 722 of the Penal Law — disorderly conduct. There were three complaints, the one against Grace De Cecca charging that on January 8, 1941, at Church and Flatbush Avenues, Kings County, said defendant * ‘ did station herself at said location holding a sign in such a manner as to interfere with pedestrian traffic the said sign bearing phrases that were likely to cause a breach of the peace. There was a number of persons both male and female gathered around defendant passing threatening remarks to and about defendant.”
*214 The second complaint, against George Messner, alleged that OR the same date and at the same place said defendant “ did statioti himself at said location and did carry a sign the said sign bearing phrases that were likely to cause a breach of the peace, the said sign being held in such a manner as to obstruct and interfere with pedestrian traffic.”
The third complaint alleged that on the same date in Kings; County, the defendants John De Cecea, William Daily, Joseph. Bohannon, David Lustrom, Peter War go, Raymond Petry,. Walter Crabb, Robert Morgan and Albert Cummings “ did. station themselves at various points between Church Avenue and Albemarle Road on Flatbush Avenue holding signs in such a manner as to interfere with pedestrian traffic and said signs; did bear phrases that were likely to cause a breach of the peace.. There were a number of persons both male and female gathered around defendants and the said persons were passing threatening remarks to defendants.”
By stipulation the three cases were tried as one. Repeatedly throughout the record the trial court stated that the question to be determined was whether there had been an obstruction of traffic. In fact, the assistant district attorney in charge of the prosecution stated in connection with the examination of the defendant Morgan, that this was “ a case of a traffic interference on Flatbush Avenue as charged in the complaint.”
In its opinion the trial court stated the question to be (1) whether defendants unduly interfered with pedestrian traffic (2) whether the placards which defendants exhibited tended to offend or disturb pedestrians, and (3) whether the pamphlets which defendants were displaying and selling tended to incite public opinion to the point of disorder and violence.
As to number (1), interference with traffic, it appears from the record that the sidewalks where defendants were stationed along Flatbush Avenue and on Church Avenue were not less than 15 feet in width. The officers testified that not more than four or five persons at any given time gathered around any one of the defendants who were stationed about 100 feet apart. On the subject of traffic interference defendants testified that there were fewer than five persons at any time around any one of them. It is true the officers testified that some pedestrians had to walk around defendants and that some even walked out into the gutter while others had to walk and squeeze their way through with others. It is difficult to consider this as an interference with traffic when we take into account that upon the officers’ own version there were not more than five persons around any one defendant at a given time and that the sidewalk *215 was not less than 15 feet in width. The occurrence took place around 7:30 p.m. on January 8, 1941. It appears from the evidence that it was a cold night which would tend to reduce the number of persons stopping to gather around defendants. It may be noted that, strictly speaking, each complaint charged the defendants respectively with “holding a sign, (or signs) in such a manner as to interfere with pedestrian traffic.” The record is devoid of any testimony to support this charge. Apparently the signs were held upright in the usual manner and were not made use of directly to interfere with or divert pedestrian traffic. Viewing the testimony as a whole it is but fair to say there was no substantial interference with traffic on the part of defendants.
As to points (2) and (3), whether the placards tended to offend or disturb pedestrians or tended to incite public opinion to the point of disorder or violence, it is to be observed there is no evidence of any assault or attempted or threatened assault by pedestrians upon defendants. Officer Hamilton testified that there were five people standing around defendant Grace De Oecca “ passing remarks, such as, ‘ We should take them signs away from them and chase them out of here and that they didn’t approve of what was on that sign, so therefore I placed the woman under arrest for likely to cause a breach of the peace. ’ ’ At another point this officer testified that he took this defendant ‘ ‘ into protective custody ’ ’ and ‘‘ for no other-purpose ”.
It appears that the signs carried by defendants varied as to the reading matter. For instance Exhibit 1 reads:
“ Abandon Religion. Serve God and Christ.
“ Read The Watchtower, 5^ Per Copy.”
And the reverse side reads: “ Consolation, a Journal of Fact, Hope and Courage. Exposing Hypocrisy. 5^ Per Copy.” Exhibit 2 reads:
“ Religion is ruining the Nations.
“ Christianity will save the People.
“ Read Consolation, 5^ Per Copy.”
And the reverse side reads:
“ Religion is a Snare.
“ The Bible answers why.
“ Read The Watchtower, 5(; Per Copy.”
Exhibit 3 is the same as Exhibit 1, and Exhibit 4 is the same as Exhibit 2. Exhibit 13 reads: ‘ ‘ Read Consolation. It is Uncensored and Unbiased. 5<j> Per Copy.”
And the reverse side reads: ‘‘ Learn the Difference Between Religion and Christianity.”
*216 It is contended by the People that the carrying of signs with printed matter such as appears in' the foregoing exhibits constitutes disorderly conduct. This presents a question not entirely free from difficulty since it has a bearing upon liberty of assembly and freedom of speech and of the press.
On November 26, 1940, a decision was rendered by this court in People v. Hussock (6 Misc 2d 182), as to a member of Jehovah’s Witnesses, affirming the conviction of said defendant for disorderly conduct. In that case the complaint charged that “ the said defendant did unlawfully and with intent to provoke a breach of the peace and whereby a breach of the peace might be occasioned, at about the hour of 7:45 P. M. this date (March 28, 1940) while selling magazines, cause a crowd to collect, and refuse to move on when ordered by the deponent. ’ ’ Said defendant Hussock was addressing a crowd of about 100 people at 44th Street and Broadway, New York County, and at the same time was selling pamphlets and discussing religion. The officer testified he heard defendant say ‘ ‘ Religion is the greatest racket on the face of the earth ”, and had a sign in his hand reading, “ The Watchtower Explains the Theocratic Government, 5<j> Per Copy.”, and the reverse side, “ Learn the difference between Religion and Christianity.” The defendant in that case, as in this, was certified by the Watch Tower Bible and Tract Society as being an “ Ordained minister of Jehovah God to preach the gospel of God’s Kingdom under Christ Jesus.” In affirming the conviction of said defendant Hussock, this court pointed out that the testimony disclosed the officer had directed the defendant to move on and defendant had refused so to do. In the instant case there was no direction by the officer to the defendants to move on and hence no refusal to comply with a lawful order upon the part of the police.
The attention of the court is drawn to the ease of Cantwell v. Connecticut (310 U. S. 296). In this case the defendants below, Newton Cantwell and his two sons, Jesse and Russell, were members of the group known as Jehovah’s Witnesses claiming to be ordained ministers of this group. They were arrested in New Haven, Connecticut and charged in the Court of Common Pleas of New Haven County upon an information containing five counts. One of these counts, the third, was concerned with section 6294 of the General Statutes of Connecticut and another, the fifth, charged the commission of the common-law offense of inciting a breach of the peace. In reviewing the evidence pertaining to this last-named charge, Mr. Justice Roberts in his opinion (pp. 302-303) set forth that the defendant Jesse Cant-well had, “ stopped two men in the street, asked, and received, *217 permission to play a phonograph record, and played the record ‘ Enemies ’, which attacked the religion and church of the two men, who were Catholics. Both were incensed by the contents of the record and were tempted to strike Cantwell unless he went away. On being told to be on his way he left their presence. There was no evidence that he was personally offensive or entered into any argument with those he interviewed.” The court held (p. 308) upon that state of facts that the conduct of said defendant Jesse Cantwell did not constitute a breach of the peace within the common-law concept of that term. It was pointed out in the opinion that while common-law breach of the peace includes not only violent acts but acts and words likely to produce violence in others, a State “ may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions.” It is to be inferred from the opinion that had the defendant Cantwell’s conduct been noisy, truculent, overbearing or offensive his conviction would have been sustained. In concluding its opinion the court stated (p. 311): “ Although the contents of the record not unnaturally aroused animosity, we think that, in the absence of a statute narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State, the petitioner’s communication, considered in the light of the constitutional guarantees, raised no such clear and present menace to public peace and order as to render him liable to conviction of the common law offense in question.”
It is true that in the instant case there is a statute, viz. (Penal Law, § 722, subd. 2), which defines disorderly conduct as follows:
“Any person who with intent to provoke a breach of the peace, or whereby a breach of the peace may be occasioned, commits any of the following acts shall be deemed to have committed the offense of disorderly conduct:
ii q * « *
“ 2. Acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others.”
The language of this statute is certainly broad, so broad that the courts have frequently held it must be limited in its application. The record before us discloses no disturbance or interference with the public on the part of the defendants, unless it be held that the signs in question per se tend to a breach of the peace. In the light of the decision of the United States Supreme Court in Cantwell v. Connecticut (supra), we cannot so hold. In passing upon the issues in the instant case, it is essential that we keep in mind what was done by defendants, i.o., the acts as bearing upon the question of whether they were *218 guilty of disorderly conduct as defined in section 722 of the Penal Law. It is true that in cases of this sort the court is confronted with the duty of weighing the right of freedom of speech and of the press on the one hand and conduct that is legally disorderly on the other. If the police as peace officers had noted actual or threatened public disturbance due to defendants ’ conduct and had ordered defendants to move on and they had refused to do so a different question would be before us.
The record contains certain errors upon the part of the trial court in sustaining objections to various questions asked by defendants’ counsel, but in view of the conclusion arrived at herein it is unnecessary to comment thereon. It is our opinion, based upon a consideration of the decision of the United States Supreme Court in Cantwell v. Connecticut (supra), that the judgments herein should be reversed and the complaints dismissed. So ordered.
Flood and Hofmanh, JJ., concur.
Judgments reversed, etc.