William C. Hecht, Jr., J.
The convictions all spring from a public meeting held by the so-called “ May 2nd Movement ”, an organization formed at Yale University in March, 1964, for the purpose of protesting American involvement in the war in Viet Nam. The meeting was held in Duffy Square, an island located at the intersection of Broadway and Seventh Avenue and bounded by 46th and 47th Streets.
The prosecution’s witness, Detective Behr, testified that on August 8,1964, at approximately 4:00 p.m., the defendant Laub “ mounted the steps on the southern end of the statue. ” located in Duffy Square and proceeded to speak through a ‘ ‘ battery-powered megaphone ” which provided loud amplification. The witness added:
He (Laub) stated that the May 2nd movement had called this meeting and then proceeded to introduce Mr. Philip Luce, whom he stated would be the chairman for this meeting. Mr. Luce began to speak. At this point, representatives of the Police Department, a captain and an inspector, spoke to Mr. Luce, Mr. Laub, Mr. Maher, and, I believe, also Mr. Copeland.
* * *
The police captain informed Mr. Laub, Mr. Maher, and Mr. Mopeland [sic], and Mr. Luce, that at the present time the demonstration was interfering with pedestrian and vehicular traffic; that people had to walk into the street to get by.
6 * *
That in view of this interference with pedestrian and vehicular traffic, that the meeting would have to be terminated at this location at this time.
Mr. Laub then took the battery-operated megaphone again and put it up to his mouth and proceeded to speak into it and spoke to the people assembled there. There were approximately two hundred people assembled there. He, stated to them that this captain — I believe he stated, “The captain standing on my left, I think he should be standing on my right, has informed me that we can’t continue our peaceful demonstration here.”
*613 Then he informed the people that in spite of this, they would continue their demonstration and he again gave — I believe he gave the megaphone to Mr. Copeland — no, to Mr. Luce, again. Mr. Luce then continued to speak and introduce Mr. Vincent Copeland. Mr. Copeland spoke into another battery-operated megaphone which he carried. He spoke to the people there, speaking of the crimes of American imperialism against the working people.
The Captain again told the four above-named defendants that the demonstration interfered with pedestrian and vehicular traffic and had to be terminated, and again the defendant Laub announced his defiance of this request.
Behr further testified that in the area surrounding the Square there were approximately 4,000 to 5,000 people. Pedestrians ‘ ‘ were forced to go into the street to walk around the people assembled * * * for the demonstration ” and cars veered sharply right on Broadway and left on Seventh Avenue “ to avoid persons who were in the street walking north and south around the demonstration ’ ’. Some of the demonstrators, including some defendants, were in the street. There was chanting and shouting (“Let him speak”) and drums beating and the defendant Maher struck a police horse with a rolled-up placard. There were 15 or 16 police officers present, two of whom were on horseback. Some pedestrians complained to the police of having to walk in the streets. “ There was a lot of shouting going on ” but Behr did not know which of the defendants were shouting or what they were shouting prior to the Police Captain’s order to disperse.
Patrolman Koopman testified that after the second command was defied by Laub:
[T]he captain directed the ten patrolmen and one sergeant, who were across the street, to come over and disperse the crowd and also the two officers on horses and they came to the crowd from the 'Seventh Avenue side and they started telling everybody to disperse and at that time — then the horses came on behind the foot patrolmen and then Mr. Maher ran past me and ran over to one of the horses and started smacking it with some kind of a sign, or something. I don’t know what he was hitting it with. That’s when everybody started shouting and yelling and running.
As a result of the commotion on Duffy Square, a crowd was caused to collect, numbering approximately 2,000.
Officer McNulty testified that defendant Meisner ‘ ‘ was running around * * * calling to others, shouting that they did not have to leave; that they could stay”. The officer told Meisner, “he must keep moving and not to try to encourage these people to stay any longer. Ho continued to shout that this is America” and was then arrested. Defendant Jerome was told to “move away” after he was observed “ running from one group to another around the park ”, behind a mounted *614 policeman who was attempting to disperse the crowd, and shouting that the demonstration was lawful and 4 4 the fascist police had no right to stop them ”. Jerome refused to move and was arrested.
Patrolman Engelhard! testified that he arrested the defendants Shallit and Chadwick. Miss Chadwick ‘ ‘ was standing on the sidewalk yelling ’ ’ to officers who were attempting to remove the defendant Kunis after he lay down in the street, “ Leave him alone facists [sic] ”. Chadwick then sat down on the sidewalk herself, refused to get up, and when the officer 4 4 went to pick her up * * * she started punching me and went to bite me ”. Defendant Shallit was shouting to the demonstrators not to move, calling the police “fascists” and shoving and pushing officers.
Patrolman Coffey testified that defendant Ehoads was screaming and running, and when he refused to leave the Square, he was arrested. As- the officer was taking Ehoads to a commandeered cab, “ Ostrow came over and told me to leave the defendant (Ehoads) alone ” — he (Ostrow) was screaming “ fascist cop ” and was told to be quiet or he would also be arrested. He refused and was arrested.
Patrolman Campbell testified that after Captain McAllister spoke to Laub about dispersing, Laub, through the megaphone, told the crowd not to break up and called the police ‘ 4 fascist cops”. The officer asked Laub “to move off the sidewalk”, Laub refused and was arrested.
Officer Hines testified that defendant Copeland spoke to the crowd through a megaphone and ‘ ‘ was going back and forth across Duffy Square ”. Copeland was asked if he had a permit for use of the megaphone, claimed he did not need one, was ordered to leave the area, refused, and was arrested.
Patrolman Fahy testified that defendant Kunis was 4 4 yelling and screaming 4 fascists, police brutality, gestapo ’ ”, was told to stop or be arrested, ran 44 into the middle of Broadway and laid down ”, refused to move, causing traffic to back up, and was arrested and carried to a radio car. Defendant Eckkardt was also “ lying ” in Broadway, refused to get up, and was assisted to' his feet and then arrested.
Patrolman Knoll testified that defendant Gelles was standing on the sidewalk with two others, was told he was blocking’ traffic and should move, ranted at the officer about “ fascist cops”, refused to move on, invited his own arrest, and was arrested. The officer was placing Gelles in a cab when he saw the defendant Kyllingstad slap a police sergeant with whom she had been 4 4" loudly conversing ”. She was then arrested.
*615 Patrolman Walsh testified that he arrested the defendants Apter, Martin and Teahan. Apter was running hack and forth from street to sidewalk telling the crowd not to obey the police orders, was told to desist, continued his shouting to the crowd, and was arrested. He then threw himself on the ground and, as the officer tried to put him in a cab, defendants Martin and Teahan intervened and attempted to take Apter away while yelling “Police brutality * * * gestapo”. They were warned to move away or be arrested, refused, and were arrested.
Upon cross-examination, Officer Walsh testified that in his opinion there were “ about 250 to 300 ” people present at the demonstration, traffic was stalled because “ at intervals the crowd would keep running back and forth into the street with placards * * * so, we attempted to get them back on the sidewalk, to put the traffic through ”.
Patrolman Annitto testified he arrested the defendants Maher and Turner. Maher was ‘ ‘ running around ” * * waving a placard. He struck a police horse with the placard ’ ’ and was arrested. “ Turner was screaming and hollering and trying to keep two policemen from keeping the prisoner they were trying to bring to the car ”.
Defendant Philip Luce, the first witness called by the defense, testified that he arrived at Duffy Square on August 8, 1964, at approximately 3 -.45 p.m. He was an organizer and leader of the meeting and about 10,000 leaflets had been distributed around the city announcing the meeting. Before the speeches started, Luce and some others present were told by a uniformed policeman:
[Tjhat we could not hold a meeting there; that there was a ban on demonstrations in Times Square; that we could move either north o£ 59th Street or south of 40th Street and hold a meeting; but that no meetings would be allowed within that area.
Luce further testified that about 20 or 25 people were given identifying arm bands and were placed around the perimeter of the Square “in charge of keeping the crowd orderly” and preventing people from going out into the street. About 100 to 150 people were gathered at the Square for the speeches. Laub opened the meeting by stating it would be “ a peaceful, orderly meeting ”, introduced .him (Luce) and he spoke briefly on behalf of the “May 2nd Movement”. Luce then turned over the meeting to Copeland. The people assembled did not push, shove, fight or carry weapons. “The entire assembly ” was on the Square, not on the street, and there was no interference with vehicular traffic. After Copeland had spoken for 15 or 20 seconds, a police officer informed, them that the meeting was illegal *616 and had to be terminated. Copeland continued speaking ana Lanb then repeated the officer’s command to the crowd. There was no disturbance until suddenly about 12 foot police appeared and two mounted police rode into the crowd and arrests were made.
Upon cross-examination, Luce testified that he, Laub, and Copeland used the megaphone and it was possible that some people were on the street as well as the sidewalk.
Joseph Leliveld, a New York Times reporter, was called for the defense and testified that he arrived at Duffy Square shortly before 4:00 p.m., and none of the demonstrators had yet arrived. About 15 minutes or half an hour later, people with signs arrived, some distributing leaflets, and the speakers, standing on the steps, began the proceedings. There were no more than 60 people listening and they were all compactly on the sidewalk of the Square. The situation became chaotic after the police requested the crowd to disperse, and several people started speaking at once, protesting the police order and announcing defiance of it, after which the police moved in. The witness did not think there was any interruption with traffic prior to the police moving in to disperse the crowd. The number of people on Broadway and Seventh Avenue seemed normal for a Saturday afternoon in the Summer of 1964.
Upon cross-examination, Leliveld testified that as the meeting was being dispersed, “ traffic was pretty well stopped, because prowl cars were converging on the park and all empty taxicabs were being stopped ”. The witness saw a girl hit a policeman and a boy lie down and hold himself stiff while being carried into a police car. He did not recall seeing any of the demonstrators on the street although he was unable to observe the entire area.
Defendant Albert Maher testified that he hit a police horse with a rolled-up placard in order to make it shy away and to prevent it from stepping on a person who had fallen to the ground. The witness estimated the size of the gathering at about 100 people.
Defendant Ostrow testified he was given an arm band and designated as a monitor to help maintain order and keep those attending the meeting within Duffy Square itself and not out on the street. He estimated there were between 80 and 100 people present.
Defendant Teahan testified that he saw Kunis lying on the sidewalk (not the street) and then being carried by the police to a car. He alleged he was pushed around by several policemen, finally being pushed into the road in front of a squad car *617 and was then “ grabbed ” by an officer, who said, “ Come along with me ” and took him to a commandeered cab, put him in and ‘‘ proceeded to punch me in the mouth, with two witnesses (defendant Martin and Officer Walsh) present”. He denied trying to pull the defendant Apter away from Officer Walsh.
Defendant Martin testified he had come to the meeting to speak, and, after seeing Copeland and Meisner led away by the police, he followed and:
[W]as approached by an officer who said, ‘Do you want to go too, Bud?’ and I could see him only out of the corner of my eye. I reeled a little bit, and he grabbed me under an arm; and another officer grabbed me under this arm; and they carried me to a cab, where the defendant Apter and Patrolman Walsh were already in; and they threw me in the front seat.
Martin denied having interfered with the arrest of defendant Apter, but admitted he “ may have ” yelled things, like “ fascist police ”, “ brutality ”, etc. He also denied resisting arrest but claimed he was in severe pain because the police were poking him in the kidneys.
Defendant Apter denied sitting or lying down in Duffy Square. He was a monitor with an arm band, designated to keep order and prevent people from ‘1 spilling into the street or obstructing traffic ”. He admitted he was running around and screaming “ fascist cops ”.
Defendant Eckhardt testified that he had followed defendant Kunis as Kunis was being carried to a patrol car after sitting down on the sidewalk. He was not taken to the car or even touched by the police and was told he was arrested after arriving at the station house. He denied lying down on the street.
Defendant Chadwick testified that she saw defendant Kunis either lie down or sit down on the sidewalk and then lifted and taken to a patrol car by the police. She never saw Eckhardt sit or lie down. She admitted trying to bite Officer Engelhardt but did not believe she punched him.
Defendant Kunis testified that he sat down on the Square. He saw horses ‘ ‘ turning in circles around, knocking people all over, and policemen on the horses swinging their clubs at people” and “I had no other recourse but to sit down and refuse to cooperate with the people inflicting what I saw upon the crowd”. Upon cross-examination, Kunis admitted that ‘ ‘ when the police came to take me I went completely limp and laid down ” — on the sidewalk, not on the street. His body was in a stiff position while being carried and he did not intend to co-operate with the police.
Defendant Kyllingstad testified and denied that her ‘ ‘ actions could have been construed as slapping a police officer ’ \ She *618 admitted she struck an officer on the back in the course of attempting to convince him not to arrest defendant Laub.
Defendant Meisner testified he made no noise prior to the time the police began dispersing the crowd, but then yelled, ‘ ‘ Let them speak ’ ’ and may have shouted ‘ ‘ that they did not have to leave; that they had a right to speak; that that was a constitutional right”. He denied having refused an officer’s request to leave the sidewalk.
Defendant Turner testified he was not a member of any sponsoring organization but was asked by Laub and agreed to serve as a monitor to “ help maintain order, to allow for pedestrian traffic, and to keep people out of the street ’ ’. He estimated that ‘ ‘ possibly 100 people, and no more, were in attendance at the meeting ” prior to the arrival of the police. After the order to disperse, the crowd was chanting “Let them speak”. He added:
Well, the chanting continued for about — no more than a minute and a half, when nothing happened, when the Captain and a few patrolmen who were in a line across the front of the steps left the scene; and, suddenly, the patrolmen and the horses came from each side of the Square, behind the monument; and they appeared to charge headlong into the center of the crowd, and then began to move around, forcing people off the sidewalks on either the west or the east side of Duffy Square.
TJpon this appeal, defendants-appellants argue: (1) that the record fails to show “ substantial interference with normal traffic movements ’ ’ prior to the police order to disperse so that there was no violation of section 722 of the Penal Law and therefore, the order to disperse was without authority and failure to obey it was not unlawful; (2) the order to disperse was an unwarranted interference with appellants ’ constitutional rights to freedom of speech and peaceful assembly as those rights have been enunciated by the United States Supreme Court; (3) if Captain McAllister’s order was based on a general police ban of all meetings and demonstrations in the area, “ such a ban over an extensive area for an indefinite time is clearly unconstitutional ”; (4) under the circumstances, both the meeting and appellants’ failure to obey the order to disperse were constitutionally protected conduct; (5) evidence of any of the appellants’ conduct following their refusal to obey the order to disperse may not be considered in support of their convictions; and (6) subdivisions 2, 3 and 4 of section 722 of the Penal Law as applied to street meetings, are so vague and uncertain as to be violative of due process of law.
Firstly, let it be said that the evidence in the record of a general police ban on meetings in the area is, at best, very *619 sketchy and would clearly be an insufficient basis upon which to premise the prosecution’s case.
Secondly, although the prosecution introduced evidence that Duffy Square was technically a “ park ” and that Park Department Regulations require a permit for public meetings, it is clear that such evidence was not subsequently relied upon in any fashion and is not urged as a basis for sustaining the convictions here. This aspect of the case will not be considered.
Thirdly, while subdivisions 2, 3 and 4 of section 722 of the Penal Law contain terms which are general and may be subject to differing interpretations, it need not follow that they are, therefore, too vague and indefinite to adequately provide guide lines for appropriate and inappropriate conduct at street meetings. The provisions of these subdivisions have been many times the ready subject of reasonable construction and application to public behavior, oftentimes proscribing it, while frequently rejecting, as unlawful, its inhibition (see e.g., People v. Bogin, 248 N. Y. 530; People v. Lo Vecchio, 185 Misc. 197; People v. Hussock, 6 Misc 2d 182, cert. den. sub nom. Hussock v. New York, 312 U. S. 659).
It should be noted that it is unquestioned that evidence of a violation of any subdivision of section 722 of the Penal Law will support a conviction thereunder, regardless of whether the complaint charges a defendant under one particular subdivision or another (People v. Carcel, 3 N Y 2d 327, 331; People v. Hipple, 263 N. Y. 242, 244). Such being the case, the convictions would be proper if based on proof of conduct violative of any subdivision and it is clear that the trial court may have convicted certain defendants on the basis of conduct after the police order, and others for their conduct prior thereto. There is therefore no substance to the contention that conduct after the order may not be considered because the trial court may have found certain defendants guilty without proof of any such conduct. Further, there is ample in the wording of the complaint to justify sustaining the charges by evidence of conduct after the order. The complaint charges unlawful congregating, obstruction of pedestrian and vehicular traffic, noisiness, causing a crowd to collect, and a failure to follow the police order to disperse. Clearly defendants’ conduct after the order is material and proper in showing the failure to obey it. I believe such proof to be proper within the charges for violations falling under subdivisions 2 and 4 also.
We come then to the heart of the case — the lawfulness of the defendants’ conduct and the appropriateness of the police command. Treating initially the charged violations under *620 subdivision 2, our Court of Appeals has frequently weighed the nature and effect of a defendant’s conduct as judged by the standards of this provision of section 722 of the Penal Law. As stated by the court (per Burke, J.) in People v. Carcel (3 N Y 2d 327, 331-332): “ The common-law definition of ‘ breach of peace ’, though not controlling, is helpful in ascertaining the nature of the acts proscribed by the statute. In People v. Most (171 N. Y. 423, 429) it was defined as a ‘ disturbance of public order by any act of violence, or by any act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community.’ (See People v. Perry, 265 N. Y. 362, 364; People v. Pieri, 269 N. Y. 315, 322; Cantwell v. Connecticut, 310 U. S. 296, 308.) Guided by this definition, the courts have indicated that something more than a mere inconveniencing of pedestrians is required to support a conviction under subdivision 2. As was stated in People v. Nixon (248 N. Y. 182, 187-188): ‘Men and women constantly congregate or walk upon the streets in groups, quite oblivious of the fact that in some degree they are thereby causing inconvenience to others using the street. A public meeting may have aroused such interest that groups of men and women continue the discussion while walking up and down the street. Groups linger in quiet social converse after the religious edifice where services have been held is emptied. School children and college youths, laborers, athletic “fans” and church members, perhaps even judges, do at times congregate or walk upon the streets in numbers sufficient to cause other pedestrians to stand aside or step into the roadway. Surely such conduct is not always “ disorderly” and does not always tend to a breach of the peace. ’ In the Nixon case it was held that there was insufficient evidence to warrant a conviction under subdivision 2 of section 722, although it was shown that the 20 defendants were parading on a New York City street 4 abreast on a sidewalk only 12 feet wide. ‘ The regular amount of traffic was just barely getting through ’ (p. 185) and the obstruction caused by the pickets was such that some people were caused to enter the roadway to pass. Certainly the evidence against defendants in the case at hand was no more impressive than that offered by the People in the Nixon case. There is absolutely no showing here that defendants caused any serious annoyance to pedestrians or that their manner was threatening or abusive. Indeed, the only evidence upon which the conviction might be predicated was the arresting officer’s simple statement that, the defendants ‘ were blocking the pedestrians’ right of way That evidence we hold to be insufficient *621 (People v. Nixon, supra; People v. De Cecca, 6 Misc 2d 213; People v. Kieran, 6 Misc 2d 245; People v. Barisi, 193 Misc. 934, 935; People v. Lo Vecchio, 185 Misc. 197).” (Emphasis supplied.) It is difficult to precisely define just how “ serious ” the annoyance or interference must be and the evidence did not clearly establish which, if any, of the defendants could be deemed in violation of this subdivision 2 prior to the order to disperse, but the testimony of the arresting officers, apparently deemed credible by the trial court, reciting the individual defendant’s conduct after the order, would, in my view, abundantly support the convictions under subdivision 2 of all save perhaps Laub and Copeland. Kunis, Chadwick, Eckhardt and Apter all lay down or sat down; all but Eckhardt were yelling and screaming and inciting to disorder. Meisner, Jerome, Shallit, Rhoads, Ostrow, Gelles, Kyllingstad, Martin, Teahan, Turner and Maher were running about interfering with police officers, shouting and screaming and generally causing bedlam. All these defendants clearly acted 1 ‘ in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others ’ ’.
For me, it would be difficult, if not impossible, to justify this conduct even were it determined that the police order was improper and without lawful authority. While it is clear that “ One cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution ” (Wright v. Georgia, 373 U. S. 284, 291-292; Henry v. City of Rock Hill, 376 U. S. 776), there is no support for the proposition, seemingly advanced here, that if the order were improper, any and all defendants ’ subsequent conduct would be cloaked with an immunity to arrest. I do not believe the order to be improper, but quite aside from the import of a refusal to obey that order (a violation of subdivision 3 discussed infra), the defendants are properly chargeable with the nature and consequences of their acts. Even a completely unlawful police arrest will justify only “ reasonable resistance ” (People v. McNeil, 15 N Y 2d 717). An unlawful arrest would afford a defendant 1 ‘ the right to resist and use ‘ force and violence ’ against the officer ‘ in preventing or attempting to prevent an offense against his person ’ provided such ‘ force or violence used [was] not more than sufficient to prevent such offense ’ (Penal Law, § 246, subd. 3)” (People v. McNeil, 21 A D 2d 1, 2, affd. 15 N Y 2d 717). But this does not sanction the conduct set forth here in defiance of a police order to disperse — not in defiance of an unlawful arrest and, in fact, prior to any arrest. Most emphatically, it cannot justify the conduct of those who sought to protest the arrests of others. There were no arrests made before the *622 defendants conducted themselves in the manner set forth above and not before all of them were repeatedly warned to desist (cf. People v. Nixon, 248 N. Y. 182, where the arrests were made without warning). This is simply not a case where the convictions depend upon the conduct of the defendants in resisting an unlawful arrest (cf. People v. Cherry, 307 N. Y. 308).
In People v. Penn (48 Misc 2d 634, affd. 16 N Y 2d 581, mot. for rearg. den. 16 N Y 2d 883), this court upheld convictions under subdivisions 2 and 3 based upon (1) the defendants’ conduct in darting and sitting in front of and under trucks, thereby interfering with their movements and causing them to stop, and (2) the defendants’ refusal to move when ordered to do so by the police. As was stated in the majority opinion in Penn (pp. 638-639):
1 ‘ While it is true that the Supreme Court of the United States has held that public grievances are within the constitutional protection of the First Amendment, it has also held that the manner of protest is subject to reasonable regulation and control in the interest of public safety and order. (Cox v. New Hampshire, 312 U. S. 569; Giboney v. Empire Stor. Co., 336 U. S. 490; Cantwell v. Connecticut, 310 U. S. 296.) (Also, see, People v. Galamison, 43 Misc 2d 72; People v. Martin, 43 Misc 2d 355.)
“In Cox v. New Hampshire (supra, p. 574) the court said: * Civil liberties as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need. Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection.’
“In Giboney v. Empire Stor. Co. (supra, p. 498) the court said: ‘ It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to * * * conduct in violation of a valid criminal statute. We reject the contention now.’
*623 “In Cantwell v. Connecticut (supra, p. 308) the court said: ‘ The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious.’ ” See, also, Schneider v. State (308 U. S. 147, 160-161) where the Supreme Court struck down unconstitutionally restrictive ordinances against the dissemination of information or opinion but stated: “ Municipal authorities, as trustees for the public, have the duty to keep their communities’ streets open and available for movement of people and property, the primary purpose to which the streets are dedicated. So long as legislation to this end does not abridge the constitutional liberty of one rightfully upon the street to impart information through speech or the distribution of literature, it may lawfully regulate the conduct of those using the streets. For example, a person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic; a group of distributors could not insist upon a constitutional right to form a cordon across the street and to allow no pedestrian to pass who did not accept a tendered leaflet; nor does the guarantee of freedom of speech or of the press deprive a municipality of power to enact regulations against throwing literature broadcast in the streets. Prohibition of such conduct would not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion.”
In the instant case we have no attempt to improperly limit opinion or its public expression. This was no effort to restrict, unconstitutionally, freedom of religion or dissemination of religious views (Cantwell v. Connecticut, 310 U. S. 296); nor to discriminate between conformist and nonconformist views; nor was there evidenced any form of prior restraint (cf. Joseph Burstyn, Inc. v. Wilson, 343 U. S. 495; Kunz v. New York, 340 U. S. 290; Niemotko v. Maryland, 340 U. S. 268; Saia v. New York, 334 U. S. 558; Rockwell v. Morris, 12 A D 2d 272, affd. 10 N Y 2d 721, cert. den. 368 U. S. 913). The conduct of the defend *624 ants here may not be properly likened to peaceful picketing and, as was noted in the dissenting opinion in Penn (48 Misc 2d 634, supra), the defendants there had not impeded street traffic and they had demonstrated in a private driveway rather than a public street — facts cogently different from those presented here.
Further, as stated above, I believe the police order to have been proper. Our State courts have upheld reasonable action of the police in seeking to disperse street meetings in areas where a breach of the peace or possibility of disorder may arise — especially in heavily-trafficked areas where vehicles and pedestrians are or may be obstructed (People v. Feiner, 300 N. Y. 391; People v. Hipple, 263 N. Y. 242; People v. Kunz, 205 Misc. 316; People v. Friedman, 6 Misc 2d 271). The police, in performing their duties, “may give reasonable directions. Present at the point where the defendants were congregating they might early sense the possibility of disorder. Even a protest from pedestrians who were annoyed by the defendants’ conduct might be a significant element in determining whether persistence in such conduct was wrongful ’ ’ (People v. Nixon, 248 N. Y. 182, 188-189). (See, also, People v. Galpern, 259 N. Y. 279, 281.) As was most aptly stated by the United States Supreme Court in the recent case of Cox v. Louisiana (379 U. S. 536, 554-555): The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement.” (Emphasis supplied.) In sum, it is my view that the police request to disperse was made in the line of a “ duty and responsibility to keep their streets *625 open and available for movement ” (Cox v. Louisiana, supra, p. 555), but even if the order were unnecessary or improper, the subsequent conduct of the defendants would nevertheless be unjustified and violative of subdivision 2.
In view of the general police order which was announced to the assemblage, it would seem plausible that all defendants would appropriately be charged with a violation of subdivision 3 of section 722 of the Penal Law. There is, as well, testimony in the record of specific refusals to obey the order of an arresting officer in the case of all defendants excepting Kyllingstad, Maher and Turner. What then of the propriety of the convictions under this subdivision! Contrary to appellants’ assertion, subdivision 3 would not, by its terms, ‘ ‘ prohibit all street meetings ”. It requires both that defendant “ congregates with others” and “ refuses to move on when ordered by the police ”. There must be a showing of an actual or potential breach of the peace together with a congregating and refusal to obey the police order. Although those congregating may do so in an orderly and inoffensive way, in the absence of a showing that the police direction ‘ ‘ was purely arbitrary and was not calculated in any way to promote the public order ’ ’, the refusal to obey violates the statute (People v. Galpern, 259 N. Y. 279, 284-285).
Have recent Supreme Court decisions rendered untenable the interpretation thus placed on subvdivision 3 by our State courts ! I think not. Appellants rely heavily on Edwards v. South Carolina (372 U. S. 229) and Cox v. Louisiana (supra), but analysis of the holdings there does not compel a determination that subdivision 3 is unconstitutional either on its face or as here applied.
In Edwards, 187 students, protesting discrimination, marched to the grounds of the State House in Columbia, South Carolina. They marched around the grounds, carrying placards, for approximately 45 minutes, and “As they entered, they were told by the law enforcement officials that 1 they had a right, as a citizen, to go through the State House grounds, as any other citizen has, as long as they were peaceful’” (p. 230). Some 200 or 300 spectators had gathered to observe the march and “ nobody among the crowd actually caused or threatened any trouble” (p. 231). Most importantly “ There was no obstruction of pedestrian or vehicular traffic within the State House grounds * * * Although vehicular traffic at a nearby street intersection was slowed down somewhat [and] an officer was dispatched to keep traffic moving” (pp. 231-232). The police authorities then advised the group that there would be *626 arrests unless they dispersed within 15 minutes. “ Instead of dispersing, the petitioners engaged in what the City Manager described as ‘ boisterous ’, ‘ loud and ‘ flamboyant ’ conduct, which, as his later testimony made clear, consisted of listening to a ‘ religious harangue ’ by one of their leaders, and loudly singing ‘ The Star Spangled Banner, ’ and other patriotic and religious songs, while stamping their feet and clapping their hands. After 15 minutes had passed, the police arrested the petitioners and marched them off to jail ” (p. 233).
The court, in reversing convictions based on a breach of the peace under State law, specifically stated (pp. 236-237): “ We do not review in this case criminal convictions resulting from the evenhanded application of a precise and narrowly drawn regulatory statute evincing a legislative judgment that certain specific conduct be limited or proscribed. If, for example, the petitioners had been convicted upon evidence that they had violated a law -regulating traffic, or had disobeyed a law reasonably limiting- the periods during which the State House grounds were open to the public, this would be a different case. (See Cantwell v. Connecticut, 310 U. S. 296, 307-308; Garner v. Louisiana, 368 U. S. 157, 202 concurring opinion.) These petitioners were convicted of an offense so generalized as to be, in the words of the South Carolina Supreme Court, ‘ not suspectible of exact definition.’ And they were convicted upon evidence which showed no more than that the opinions which they were peaceably expressing were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection.” In other words, the thrust of the court’s holding, under facts markedly dissimilar from those with which we are confronted, was to vitiate a statute which was aimed at and employed for the purpose of inhibiting, by means of criminal sanction, “ the peaceful expression of unpopular views”. We have no such case here. There is no claim, nor could there be, that either the statute here involved or the police action taken was meant to restrict the expression of views, popular or unpopular. There is no discriminatory application alleged. Our determination is clearly made by means of “ evenhanded application” of a regulatory statute which, reasonably construed, is meant to insure maintenance of order by ‘ ‘ limiting or proscribing ” certain conduct.
The opinion in Edwards specifically pointed out (p. 236) that the fact situation there presented ‘1 was a far cry from the situation in Feiner v. New York, 340 U. S. 315”, where the Supreme Court last had an opportunity to interpret and pass upon the validity of subdivision 3 of section 722 of the Penal *627 Law. In Feiner, the petitioner had been convicted in the Syracuse Court of Special Sessions for a violation of subdivisions 1, 2 and 3 of section 722 of the Penal Law. His conviction had been affirmed in the New York Court of Appeals (300 N. Y. 391) and the Supreme Court granted certiorari to determine whether “ the conviction is in violation of his right of free speech under the Fourteenth Amendment” (p. 316). The petitioner, in March, 1949, had been addressing a street meeting in Syracuse attended by approximately 75 or 80 people “ both negro and white, filling the sidewalk and spreading out into the street”. He had been referring derogatorily to President Truman, the American Legion, the Mayor of Syracuse, and other public officials. Police officers observed the scene for a while and, after indications of excitement, restlessness and some pushing and shoving, the officers “ stepped in to prevent it from resulting in a fight ’ \ Petitioner was three times requested to stop speaking but refused to do so while “ the crowd was pressing closer around petitioner and the officer ”. The officer then arrested the petitioner and brought him down from the wooden box upon which he was standing. The conviction was premised primarily on petitioner’s failure to “ obey reasonable police orders ” (subd. 3).
The Supreme Court, in affirming, stated (pp. 319-320): “ We are not faced here with blind condonation by a state court of arbitrary police action. Petitioner was accorded a full, fair trial. The trial judge heard testimony supporting and contradicting the judgment of the police officers that a clear danger of disorder was threatened. After weighing this contradictory evidence, the trial judge reached the conclusion that the police officers were justified in taking action to prevent a breach of the peace. The exercise of the police officers’ proper discretionary power to prevent a breach of the peace was thus approved by the trial court and later by two courts on review. * * * They found that the officers in making the arrest were motivated solely by a proper concern for the preservation of order and protection of the general welfare, and that there was no evidence which could lend color to a claim that the acts of the police were a cover for suppression of petitioner’s views and opinions. Petitioner was thus neither arrested nor convicted for the making or the content of his speech. Bather, it was the reaction which it actually engendered. * * * This Court respects, as it must, the interest of the community in maintaining peace and order on its streets. Schneider v. State, 308 U. S. 147, 160 (1939); Kovacs v. Cooper, 336 U. S. 77, 82 (1949). We cannot say that the preservation of that interest here *628 encroaches on the constitutional rights of this petitioner.” (Emphasis supplied.)
In Cox v. Louisiana (supra) appellant, a leader of approximately 1,500 students who had peacefully demonstrated in the vicinity of the Baton Rouge Court House, against discrimination generally and particularly the jailing of 23 fellow students subsequently refused a Sheriff’s order to break up the demonstration as it was about to move uptown to several luncheon counters to protest discrimination there by means of a sit-in. Tear gas dispersed the demonstrators, and the following day appellant Cox was arrested, and later convicted of disturbing the peace, obstructing public passages and picketing before a court house. The court, in reciting the facts, pointed out that the entire demonstration was orderly and peaceful and there was no obstruction of traffic. There was further evidence that the police had condoned the demonstration at the courthouse so long as the group remained on the “ west sidewalk ” and that Cox had kept them there. The only evidence of potential unrest was some “ muttering and grumbling ” by some whites as Cox spoke of the “ illegal arrest ” of the 23 students and then asked the crowd to move uptown to the lunch counters and sit in for an hour if they were refused service.
The court, in reversing the breach of peace and obstructing public passages convictions, specifically held unconstitutional ■the Louisiana “ disturbing the peace ” statute (La. Rev. Stat., § 14:103, subd. [1]), a statute markedly similar to subdivision 3 of section 722 of the Penal Law, and determined that the case was governed by the holdings in Edwards v. South Carolina (supra) and Fields v. South Carolina (375 U. S. 44) constituting an infringement by Louisiana against Cox’ rights of free speech and free assembly. The court specifically held (p. 545): “ Louisiana may not constitutionally punish appellant under this statute for engaging in the type of conduct which this record reveals, and also that the statute as authoritatively interpreted by the Louisiana Supreme Court is unconstitutionally broad in scope ”, (Emphasis supplied.) The court pointed out that the demonstration was “very well controlled” and the group was “ orderly ” and not, according to the Sheriff’s testimony, “ objectionable ” before Cox urged them to move uptown for the sit-in. The record further showed that the singing of the students resulted only in some cheering and applause by their 23 incarcerated fellows and the general mood was never “ hostile, aggressive, or unfriendly ’ ’. The court found the arrest to be falsely cloaked in the power of the State to protect the public safety and order.
*629 It is my view that the court, in Cox, deemed the statute involved unconstitutional as it had been interpreted and applied in the State of Louisiana. I do not feel that the decision mandates a finding of unconstitutionality for subdivision 3 of our disorderly conduct statute. (A reading of the concurring opinions in Cox v. Louisiana, companion case No. 49 [379 U. S. 559], supports this postition.) There is no indication that the implicit upholding of the constitutionality of subdivision 3 in Feiner v. New York (supra) has been undermined (cf. language of Mr. Justice Clark, p. 589). Clearly, the application of subdivision 3 to the convictions here involved was not an attempt to suppress unpopular views, but was aimed solely at the maintenance of order and the avoidance of obstruction to vehicular and pedestrian traffic. There is no “ unlimited power to order people off the streets ’ ’, but rather an authority to reasonably regulate to avoid actual or potential breaches of the peace in the public interest. There is no evidence that administration of the statute here has been “ otherwise than in a fair and non-discriminatory manner which the State court has construed it to require ” (Cox v. New Hampshire, 312 U. S. 569, 577). Finally, it should be noted that the Court of Appeals in affirming this court’s determination in People v. Penn (16 N Y 2d 581) was aware of the decision in Cox v. Louisiana (see 16 N Y 2d 581, 582) and specifically held that there was no denial of the defendants’ constitutional rights.
I am of the view that subdivision 3, as applied, remains constitutional and that the convictions are valid under both that subdivision and subdivision 2.
The judgments of conviction should be affirmed.