### STATE OF CONNECTICUT *v.* ANONYMOUS (1971-2)*
### (six cases)

APPELLATE DIVISION OF THE CIRCUIT COURT

JACOBS, J. Following a jury trial, the defendants were convicted of the offense of picketing a residence, a misdemeanor (General Statutes § 1-1), in violation of § 31-120,[1] and have appealed.

These cases present issues arising out of a non-labor picketing controversy. Several errors are raised on behalf of the defendants on this appeal, but the only one we deem it necessary to consider is the challenge to the sufficiency of the evidence to support the judgments.

---

* Thus entitled, in view of General Statutes § 54-90.

---

[1] "Sec. 31-120. PICKETING OF RESIDENCES. No person shall engage in picketing before or about the home or residence of any individual unless such home or residence is adjacent to or in the same building or on the same premises in which such person was employed and which employment is involved in a labor dispute. Any person who violates the provisions of this section shall be fined not more than two hundred dollars or imprisoned not more than six months or both."

The finding[2] recites that "[t]he State and the defendants agree that there is no dispute about the facts." The defendants are members of a voluntary association called the Coalition of Concerned Citizens. This coalition is organizationally and functionally different from its labor counterpart. It has no formidable institutional backing, its membership is not cohesive, and it has no permanent, well-paid personnel. It does not seek vast across-the-board concessions from management, such as job security, higher pay, shorter hours or longer vacations. The participants in a voluntary association such as this share no highly integrated front motivated by economic gain; quite to the contrary, they band together on an issue-to-issue basis. In short, this coalition is a small but active coterie of interested citizens with few resources and little time, but possessing an immediate objective. The coalition has at various times been critical of a particular agency. Its disagreement with the agency has from time to time been publicized by means of the radio, newspapers, television and the public media generally.

Dissatisfied with the progress of the agency, the defendants, after having sought and obtained legal advice, made a peaceful and orderly march in front of the private residence of the head of the agency. The style of the protest is worth noting. It was a loosely structured ceremonial protest; it was not intimidation or coercion. The protest symbolized a deeply felt grievance. Its essential appeal was to public opinion. The defendants believed that "this

[2] In a jury case, the court is not privileged to find facts; it may do so only in a case tried to the court. *Ianni* v. *Daily*, 153 Conn. 445, 447; Maltbie, Conn. App. Proc. § 145. Since, upon the trial of this case, there was little actual dispute between the parties, no possible prejudice can have resulted to the defendants. "The facts in controversy, and such questions as we are called upon to determine, appear with sufficient clearness upon the record." *Raughtigan* v. *Norwich Nickel & Brass Co.*, 86 Conn. 281, 287; see *Piazza* v. *Norwood*, 147 Conn. 641, 644.

was the only way to bring to the attention of the general public the conditions under which certain people lived in the city and in the ghetto and poor areas." A time was decided upon by the group as the most appropriate date and time for the march in order "to get as much information out to as many people as possible, and to provide television coverage of the demonstration, and to allow people who worked to join the group in the demonstration." The demonstration was not for the purpose of direct confrontation; rather, "the primary purpose was to get across . . . ideas . . . to the general public." The finding that the defendants were at all times orderly and peaceable, that there was no unlawful obstruction of the highway, and that they did not impede the free ingress and egress of persons going to or coming from the private residence is fully supported by the evidence. The activity of the defendants was a form of protest, not disturbance nor disorder.

On the day in question, the chief of police observed a group of about fifty people gathered at a corner. He thereupon addressed the gathering with a bullhorn, advising them that residential picketing was a violation of state law. At this point a majority of the group dispersed, but "the six named defendants proceeded" and "marched in front of . . . [the] residence in single file, up and down, . . . carrying placards." The chief of police gave the marchers a second warning. They refused to disperse. They stood on what they deemed to be their constitutional rights. Their arrest followed. So far as is disclosed by the record, no person complained to the police.

## I

Residential picketing "is a constitutionally colored activity—it partakes of the rights of speech, assembly and petition." Comment, "Picketing the Homes

of Public Officials," 34 U. Chi. L. Rev. 106, 140. In *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, the court endorsed the policy that debate on public issues should be "uninhibited, robust, and wide-open." At the same time, the Supreme Court of the United States has crystallized the principle, both in its opinions and in the denial of writs of certiorari, that first amendment rights are not absolute at all times and under all circumstances. See *Adderly v. Florida*, 385 U.S. 39, 47; *Cox v. Louisiana*, 379 U.S. 536, 554; *People v. Turner*, 48 Misc. 2d 611, aff'd, 17 N.Y.2d 829, dismissed as improvidently granted, 386 U.S. 773. But in order to petition the government for a redress of grievances, "the picketers' claim to the streets is a powerful one, predicated not only on the fact that they are engaged in activity involving the expression of political ideas, but also on the nature of the streets as a traditional public forum." Comment, supra, 125. "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Hague v. Committee for Industrial Organization*, 307 U.S. 496, 515; see *Edwards v. South Carolina*, 372 U.S. 229, 232; *Kunz v. New York*, 340 U.S. 290, 293; *Schneider v. State*, 308 U.S. 147, 160; *Lovell v. City of Griffin*, 303 U.S. 444, 450. Thus, "[w]hen the citizen goes to the street, he is exercising an immemorial right of a free man, a kind of First-Amendment easement." Kalven, "The Concept of the Public Forum: Cox v. Louisiana," 1965 Sup. Ct. Rev. 1, 13 (P. Kurland ed.). "Picketing of this type [home picketing] brings home the fact that a man may leave his tools

at his work but not his conscience or his relations with his fellow man." *United Electrical, Radio & Machine Workers of America* v. *Baldwin*, 67 F. Sup. 235, 242. There is nothing in the record to suggest or indicate that the alleged grievances involved misrepresentations of fact; nor are we concerned with the truthfulness or falsity of the alleged grievances, for "[e]ven a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.'" *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279 n.19, quoting from Mill, On Liberty (Oxford: Blackwell, 1947), p. 15.

We come now to *Gregory* v. *Chicago*, 394 U.S. 111, decided by the Supreme Court of the United States after the trial of the present cases. On August 2, 1965, the appellant, Dick Gregory, assembled a group of about eighty-five persons at Buckingham Fountain at Grant Park, in downtown Chicago, at 4.30 p.m. The group intended to march to city hall, then to the home of the mayor to demand that he "fire" the superintendent of schools. Gregory addressed the marchers, telling them that they would first march to the "snake pit" (city hall), then to the "snake's house" (the mayor's home). After a brief demonstration in front of city hall, the group, led by Gregory, marched approximately five miles to the mayor's home. They reached the block where the mayor's home was located at about 7:50 p.m. The city conceded that the demonstrators were peaceful and that they limited their march to the public sidewalk. The city claimed that "[t]he site chosen for the demonstration was a residential neighborhood on the South side of Chicago. By no stretch of imagination could it be characterized as a place dedicated to the airing of public issues . . . . Rather, it was an area of small homes, wholly inap-

propriate as the site of a large protest march." The court held (p. 112): "Petitioners' march, if peaceful and orderly, falls well within the sphere of conduct protected by the First Amendment." In so holding, the court apparently rejected the argument advanced in Kamin, "Residential Picketing and the First Amendment," 61 Nw. U.L. Rev. 177, 182: "In the constitutional value scale, the quiet enjoyment and privacy of residential premises—even of the privately-owned homes of public officials—merits a higher priority than freedom of speech. A state or a municipality encounters no constitutional obstacle in drastically regulating picketing, whether labor or political, in residential areas, or even in prohibiting such activities."

We hold, therefore, that the defendants were engaged in a legitimate activity, since they had "a legitimate right, protected by the Constitution, to appeal to those in authority for redress of grievance by remonstrance, and such right must be balanced against the right of the community to peace and quiet." *Flores* v. *Denver,* 122 Colo. 71, 77 (governor's mansion); cf. *State* v. *Cooper,* 205 Minn. 333, 337, *State* v. *Perry,* 196 Minn. 481, 482, and *State* v. *Zanker,* 179 Minn. 355, 356 (all labor disputes); *People* v. *Levner,* 30 N.Y.S.2d 487, 493 (picketing of mayor's home; disorderly conduct conviction affirmed because "[h]undreds of pickets outside of a man's residence transcends dissemination of information"); *Fawick Airflex Co.* v. *United Electrical, Radio & Machine Workers,* 56 Ohio L. Abs. 426, appeal dismissed for lack of debatable question, 154 Ohio St. 205 (demonstration in front of judge's home; contempt conviction upheld; safeguarding the judicial process distinguishable as a special need).

II

The statute (General Statutes § 31-120) under which the defendants were convicted has no applica-

tion to a nonlabor controversy; we think its application is restricted to concerted activity by union organizations towards employers.[3] The defendants' activity does not constitute a labor dispute within the meaning of and as defined by chapter 562, entitled, "Labor Disputes," particularly § 31-112 (c).[4]

There is error, the judgment in each case is set aside and each case is remanded with direction to render judgment that the defendant is not guilty and ordering that he be discharged.

KOSICKI, J., concurred in the result.

CASALE, J. (concurring). I concur in the result but only on the ground, stated in Part II of the opinion, that § 31-120 of the General Statutes has no application to the situation in this case, which was concededly not related, directly or indirectly, to a labor dispute.

---

[3] See note 1, supra. The statute was enacted in 1947 (Public Act No. 123) as a direct outgrowth of home picketing in labor disputes, notably the Niles-Bement-Pond and the Yale & Town strikes. See *United Electrical, Radio & Machine Workers* v. *Baldwin*, 67 F. Sup. 235 (strike over wage dispute), decided on August 2, 1946, particularly the illuminating discussion (p. 242) on *"The ban on home picketing."* The court's denial of injunctive relief restraining interference with picketing of homes of employers undoubtedly led to the enactment of the statute forbidding residential picketing in labor disputes.

[4] "Sec. 31-112. INJUNCTIONS. DEFINITIONS. . . . (c) the term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment or concerning employment relations, or any controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the proximate relation of employer and employee."