STATE OF CONNECTICUT v. ANONYMOUS (1971–4)*

CIRCUIT COURT

* Thus entitled, in view of General Statutes § 54-90.

BIELUCH, J. The defendant was one of a group of about thirty demonstrators awaiting, with a crowd, the departure of President Nixon from a foreign policy briefing of New England newspaper editors. The demonstrators were standing behind a line of police officers. Some of the demonstrators were displaying various signs, banners, and posters. The defendant was holding one of two poles between which was suspended a banner resembling the Viet Cong flag when a citizen in the crowd tore the banner from the two poles, meeting no resistance or retaliation from the defendant or the other demonstrators. After the president's departure, the defendant was arrested.

At the defendant's appearance in court, the prosecutor filed a substitute information charging the defendant in the first count with breach of the peace in violation of General Statutes § 53-174, and in the second count with disorderly conduct in violation of § 53-175. The defendant, by his attorney, filed a motion for a bill of particulars, and compliance was ordered by the court. The bill of particulars filed by the prosecutor alleges the following facts for the prosecution of the defendant under the charges: "That . . . the accused was waving a Viet Cong flag in a crowd which was awaiting the arrival of the President of the United States, and that his actions did provoke contention in this group and to persons who witnessed the same and further that said actions were offensive to certain witnesses."

The defendant has now filed a motion to dismiss this prosecution on the ground that (1) his alleged conduct is not proscribed by § 53-174 and/or § 53-175 of the General Statutes; (2) his alleged conduct is protected under the first and fourteenth amend-

ments to the United States constitution and therefore cannot be proscribed; and (3) the above mentioned statutes are unconstitutional on their face as violative of the fourteenth amendment to the constitution of the United States and article first, §§ 8 and 9, of the constitution of Connecticut.

## I

The defendant's constitutional attack is predicated on the claim that the breach of peace and disorderly conduct statutes are (1) overly vague and (2) overly broad, thereby creating a "chilling effect" on the protected right of free expression.

### A. THE BREACH OF PEACE STATUTE (§ 53-174)

The crime of breach of the peace as set forth in § 53-174 is constitutionally sufficient. The Appellate Division of the Circuit Court answered such a constitutional claim in *State* v. *Fields,* 5 Conn. Cir. Ct. 384, 386, by holding: "It is fundamental that when a question of constitutionality is raised, courts must approach it with great caution, examine it with infinite care, and sustain the legislation unless its invalidity is clear and beyond a reasonable doubt. *Snyder* v. *Newtown,* 147 Conn. 374, 390; *Edwards* v. *Hartford,* 145 Conn. 141, 145. 'Breach of the peace' has been the subject of statutes from the days of Swift. 'The peace' has been defined in our state in many cases. It would serve no purpose to dwell on the many aspects of what constitutes 'Breach of the peace.' See *State* v. *Van Allen,* 140 Conn. 586, 589; *State* v. *Cantwell,* 126 Conn. 1, 6, 7, rev'd on other grounds, 310 U.S. 296, 309; *Malley* v. *Lane,* 97 Conn. 133, 138. The language used in the statute is plain and unambiguous. The legislative intent is clearly expressed and manifest. In our state, no statute will be held void for uncertainty if a practicable or sensible effect may be given to it. *State*

v. *Andrews,* 108 Conn. 209, 213. ' "The rule of strict construction does not require that the narrowest technical meaning be given to the words employed in a criminal statute in disregard of their context and in frustration of the obvious legislative intent." ' *State* v. *Faro,* 118 Conn. 267, 274 (quoting *United States* v. *Corbett,* 215 U.S. 233, 242). But where, as in this case, the legislative intent is clear and the language used to express it is unambiguous, there is no room for statutory construction. *State ex rel. Cooley* v. *Kegley,* 143 Conn. 679, 683; *State* v. *Zazzaro,* 128 Conn. 160, 165. Thus, § 53-174 has been held not unconstitutional on its face. *Barber* v. *Kinsella,* 277 F. Sup. 72; *Watch Tower Bible & Tract Society* v. *Bristol,* 24 F. Sup. 57, aff'd per curiam, 305 U.S. 572."

The doing of acts or the use of language which, under circumstances of which the person is or should be aware, is calculated or likely to provoke another person or other persons to acts of immediate violence may constitute a breach of the peace. *State* v. *Cantwell,* 126 Conn. 1, 7. As the court stated in *State* v. *Van Allen,* 140 Conn. 586, 589, " '[t]he peace' has been defined by us to be 'that state and sense of safety which is necessary to the comfort and happiness of every citizen, and which government is instituted to secure.' *Malley* v. *Lane,* 97 Conn. 133, 138 . . . . It is sufficient that the acts intentionally committed are of such a nature that they naturally cause serious disquietude on the part of those in the vicinity. 1 Bishop, Criminal Law (9th Ed.) § 539. No specific intent to break the peace is essential. *State* v. *Cantwell,* 126 Conn. 1, 6 . . . ; *Cantwell* v. *Connecticut,* 310 U.S. 296, 309 . . . ."

Our breach of the peace statute is not merely a codification of the common law; it includes offenses which were not criminal at common law. *State* v.

*Boyer,* 2 Conn. Cir. Ct. 288, 291. Section 53-174 does not define the crime of breach of the peace but merely specifies certain ways of committing it. Id., 292 (citing *State* v. *Cantwell,* supra, 5).

## B. The Disorderly Conduct Statute (§ 53-175)

The disorderly conduct statute, § 53-175, is also upheld in its terms. Disorderly conduct was not an offense at common law; it is punishable by statute as an offense separate and distinct from breach of the peace. *State* v. *Boyer,* supra, 291; *State* v. *Robinson,* 23 Conn. Sup. 430, 1 Conn. Cir. Ct. 292. In *State* v. *Townsend,* 6 Conn. Cir. Ct. 73, the court met a similar constitutional challenge to this law. After reviewing the problem of vagueness and uncertainty in the context of other disorderly conduct statutes similar to that in Connecticut, the court concluded (p. 77): "So, however forceful and persuasive the arguments may be compelling a determination in favor of unconstitutionality of our disorderly conduct statute, the court must bear in mind the admonition in *United States* v. *Roth,* 237 F.2d 796, 797: '[I]t is not the part of responsible judicial administration for an inferior court such as ours, whatever our personal opinions, to initiate a new and uncharted course of overturn of a statute thus long regarded of vital social importance and a public policy of wide general support.' Earlier, in *State* v. *Muolo,* 119 Conn. 323, 326, our Supreme Court said that while 'any court has power to pass on the constitutionality of a statute and it may be its duty to declare it invalid,' nevertheless 'a court should take such action only upon the clearest ground or where the rights of litigants make it imperative that it should do so. Otherwise it is better . . . to leave the decision to our higher courts, to which the matter may be brought by appeal or otherwise.' "

The breach of peace (§ 53-174) and disorderly conduct (§ 53-175) statutes meet the constitutional standards required of criminal legislation.

## II

We now deal with these crimes as applied to the defendant's conduct, measuring his claim of constitutional protection, under the first and fourteenth amendments to the United States constitution, against the charges in the substitute information as specified in the bill of particulars.

The conception of liberty under the due process clause of the fourteenth amendment embraces the right of free speech guaranteed by the first amendment, which right is thereby protected from invasion by the states. *Stromberg* v. *California,* 283 U.S. 359, 368; *Edwards* v. *South Carolina,* 372 U.S. 229, 235; *Cantwell* v. *Connecticut,* 310 U.S. 296, 303. The *Cantwell* case is a landmark ruling. The United States Supreme Court has by this decision established the constitutional standard for balancing the freedom to communicate information and opinion of the first amendment against the interest of the state in the preservation and protection of peace and good order within its borders. By its facts and particular holding, the *Cantwell* opinion now directs the path for this court to follow. *Cantwell,* as here relevant, was an appeal from the breach of peace conviction of Jesse Cantwell in our courts in that he "did disturb the public tranquility by certain acts or conduct inciting to violence or tending to provoke or excite others . . . to break the peace," a common-law definition of the offense. See *State* v. *Cantwell,* 126 Conn. 1, 3. The facts which were held to support this conviction were that Cantwell stopped two men in the street, received permission, and played a phonograph record attacking their religion and church. Both men were incensed by the contents of

the record and were tempted to strike Cantwell
unless he went away. On being told to do so, he left
their presence. There was no evidence that he was
personally offensive or entered into any argument
with the two men.

The United States Supreme Court overruled
Cantwell's conviction of invoking or inciting others
to breach of peace, holding that the Connecticut
court denied him freedom of speech and stating,
very significantly (310 U.S. at 308): "The offense
known as breach of the peace embraces a great
variety of conduct destroying or menacing public
order and tranquility. It includes not only violent
acts but acts and words likely to produce violence
in others. . . . When clear and present danger of
riot, disorder, interference with traffic upon the
public streets, or other immediate threat to public
safety, peace, or order, appears, the power of the
State to prevent or punish is obvious. Equally obvi-
ous is it that a State may not unduly suppress free
communication of views, religious or other, under
the guise of conserving desirable conditions. Here
we have a situation analogous to a conviction under
a statute sweeping in a great variety of conduct
under a general and indefinite characterization, and
leaving to the executive and judicial branches too
wide a discretion in its application."

After reviewing the facts leading to Cantwell's
arrest, the court concluded (310 U.S. at 309–10):
"Cantwell's conduct, in the view of the court below,
considered apart from the effect of his communica-
tion upon his hearers, did not amount to a breach of
the peace. One may, however, be guilty of the
offense if he commit acts or make statements likely
to provoke violence and disturbance of good order,
even though no such eventuality be intended. Deci-
sions to this effect are many, but examination dis-
closes that, in practically all, the provocative lan-

guage which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks directed to the person of the hearer. Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument. . . . In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. . . . But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."

Following *Cantwell,* the United States Supreme Court established, in *Chaplinsky* v. *New Hampshire,* 315 U.S. 568, 572, the "fighting words" exception to the constitutionally protected right of free speech. "These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words— those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." Such provocation of the average person to retaliation, thereby causing a breach of the peace, may be constitutionally proscribed. *Chaplinsky* v. *New Hampshire,* supra, 573–74.

*Terminiello* v. *Chicago,* 337 U.S. 1, 4, concerned a conviction for disorderly conduct consisting of a breach of the peace arising from disturbances by an angry and turbulent crowd and precipitated by a protested public address. The Supreme Court, re-

ferring to the *Chaplinsky* and *Cantwell* cases, supra, and acknowledging that the issue argued before it focused on whether the content of the petitioner's speech was composed of derisive, fighting words which carried it outside the pale of the constitutional guarantees, never reached that question, ruling that the jury charge defining "breach of the peace" to include speech which "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance," violated his right of free speech because "a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea."

*Edwards* v. *South Carolina,* 372 U.S. 229, 234, reviewed convictions in South Carolina, where the state Supreme Court had said that the offense of breach of the peace "is not susceptible of exact definition," but that "[i]n general terms, a breach of the peace is a violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence." The United States Supreme Court overturned the convictions, citing the *Terminiello* case and stating (p. 237) that "[t]he Fourteenth Amendment does not permit a State to make criminal the peaceful expression of unpopular views." Again, in *Cox* v. *Louisiana,* 379 U.S. 536, 551, the Supreme Court turned to *Terminiello* to reverse a conviction of breach of the peace—defined as "to agitate, to arouse from a state of repose, to molest, to interrupt, to hinder, to disquiet"—for the peaceful expression of unpopular views.

Although *Cantwell* v. *Connecticut*, 310 U.S. 296, was decided in 1940, the Supreme Court as recently as 1966, in *Ashton* v. *Kentucky*, 384 U.S. 195, emphasized its authority for the protection of first amendment rights. In *Ashton*, the petitioner was convicted of the common-law crime of criminal libel, defined in the court's charge as "[a]ny writing calculated to create disturbances of the peace." Noting (p. 198), that "[t]he case is close to *Cantwell* v. *Connecticut*," the court concluded (p. 200), again referring to *Cantwell*, that "[w]hen First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer." But again, in *Carroll* v. *Princess Anne*, 393 U.S. 175, the Supreme Court reasserted the extent of the state's interest in the preservation and protection of peace and good order within its borders, citing (p. 180) *Cantwell* v. *Connecticut*, supra, 308, for the principle "that there are special, limited circumstances in which speech is so interlaced with burgeoning violence that it is not protected by the broad guarantee of the First Amendment."

In *Bachellar* v. *Maryland*, 397 U.S. 564, the petitioners were convicted of "acting in a disorderly manner to the disturbance of the public peace." The prosecution arose out of a demonstration, protesting the Vietnam War, staged in front of a United States army recruiting station. The court's charge (p. 565) permitted a guilty verdict if the jury found that the petitioners had engaged in "the doing or saying or both of that which offends, disturbs, incites or tends to incite a number of people gathered in the same area." Observing (p. 567), that "[a]ny shock effect caused by the placards, remarks, and peaceful marching must be attributed to the content of the ideas being expressed, or to the onlookers'

dislike of demonstrations as a means of expressing dissent," the United States Supreme Court set aside the convictions (p. 571) because it was likely that the verdict resulted merely because the petitioners' views about Vietnam were themselves offensive to some of their hearers.

## III

It is of interest to note that the line of authorities extending the right of free speech to symbolism began, as did the instant case, with a violation of a so-called "red flag" statute. The leading case of *Stromberg* v. *California,* 283 U.S. 359, 361, reversed a conviction for the display of a red flag in a public place "as a sign, symbol or emblem of opposition to organized government." Affirming that the conception of liberty under the due process clause of the fourteenth amendment embraces the right of free speech, the court observed (p. 368): "The right is not an absolute one, and the State in the exercise of its police power may punish the abuse of this freedom. There is no question but that the State may thus provide for the punishment of those who indulge in utterances which incite to violence and crime and threaten the overthrow of organized government by unlawful means. There is no constitutional immunity for such conduct abhorrent to our institutions." The California statute, however, was found to go beyond this permissible limit. The display of a red flag as a symbol of opposition by peaceful and legal means to organized government is protected by the free speech guarantees of the constitution, since (p. 369) "[t]he maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system."

The Supreme Court in *Board of Education* v. *Barnette,* 319 U.S. 624, 634, outlawed a compulsory flag salute and pledge of allegiance as violative of the first amendment, because to "sustain the compulsory flag salute we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind." Correlating symbolism with free speech, the court (p. 632) spoke as follows: "There is no doubt that, in connection with the pledges, the flag salute is a form of utterance. Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind. Causes and nations, political parties, lodges and ecclesiastical groups seek to knit the loyalty of their followings to a flag or banner, a color or design. The State announces rank, function, and authority through crowns and maces, uniforms and black robes; the church speaks through the Cross, the Crucifix, the altar and shrine, and clerical raiment. Symbols of State often convey political ideas just as religious symbols come to convey theological ones. Associated with many of these symbols are appropriate gestures of acceptance or respect: a salute, a bowed or bared head, a bended knee. A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn."

The wearing of a black armband for the purpose of expressing objection to the hostilities in Vietnam and support for a truce, thereby protesting our government's policy, was upheld as "the type of symbolic act that is within the Free Speech Clause of the First Amendment." *Tinker* v. *Des Moines Independent Community School District,* 393 U.S. 503, 505.

*Street* v. *New York,* 394 U.S. 576, 578, decided in 1969, considered a prosecution for contempt of the American flag by words and act. After hearing a news report that civil rights leader James Meredith had been shot by a sniper, the appellant went out to a street intersection and burned an American flag. He then publicly spoke contemptuously about the flag. Arrested for violating the statute prohibiting public contempt of the American flag "by words or act," and for disorderly conduct, he was convicted of the former offense and acquitted of the latter. In concluding that the law was unconstitutionally applied in this case because it permitted the appellant "to be punished merely for speaking defiant or contemptuous words about the American flag" (p. 581), the court made the following observations (pp. 591–93): "[1] Appellant's words, taken alone, did not urge anyone to do anything unlawful. They amounted only to somewhat excited public advocacy of the idea that the United States should abandon, at least temporarily, one of its national symbols [and it] is clear that the Fourteenth Amendment prohibits the States from imposing criminal punishment for public advocacy of peaceful change in our institutions. . . . [2] Though it is conceivable that some listeners might have been moved to retaliate upon hearing appellant's disrespectful words, we cannot say that appellant's remarks were so inherently inflammatory as to come within that small class of 'fighting words' which are 'likely to provoke the average person to retaliation, and thereby cause a breach of the peace.' . . . [3] [A]ny shock effect of appellant's speech [to passersby] must be attributed to the content of the ideas expressed [and it] is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive

to some of their hearers. [4] [T]he constitutionally guaranteed 'freedom to be intellectually . . . diverse or even contrary,' and the 'right to differ as to things that touch the heart of the existing order' [*Board of Education* v. *Barnette,* 319 U.S. 624, 641–42], encompass the freedom to express publicly one's opinions about our flag, including those opinions which are defiant or contemptuous."

Notwithstanding its constitutional support of the appellant's conduct toward our flag, the Supreme Court felt compelled (p. 594) to "add that disrespect for our flag is to be deplored no less in these vexed times than in calmer periods of our history. . . . Nevertheless, we are unable to sustain a conviction that may have rested on a form of expression, however distasteful, which the Constitution tolerates and protects."

On December 24, 1970, the United States Court of Appeals for the Second Circuit decided the "peace emblem" case, *Long Island Vietnam Moratorium Committee* v. *Cahn,* 437 F.2d 344, striking down New York's law prohibiting superimpositions on any American flag as unconstitutional both on its face and as applied in that case. Relying on the four principles enunciated by the Supreme Court in *Street* v. *New York,* supra, the Court of Appeals extended the protection of the first amendment as established by *Street* for verbal communication casting contempt on the flag to nonverbal or visual communication involving the flag and flag alteration. The following conclusion of the court (p. 350) is of moment and determinative of the instant case: "Like the respectful and 'patriotic' flag uses discussed above, plaintiffs' flag usage is a means of expressing their views on a vital political issue and hence is protected communicative activity unless there is a valid state interest in proscribing their emblem. As shown above, the state has no such

interest. Consequently, we conclude that § 136 (a) violates the plaintiffs' First Amendment right to freedom of speech."

## IV

The court deplores the conduct of the defendant on this memorable occasion of the visit of the president of the United States to the city of Hartford but, to paraphrase the words attributed to Voltaire, is compelled to uphold the defendant's right to such unpatriotic public behavior.

For the reasons above set forth, the defendant's motion to dismiss is granted as to both counts of the information.