## EDWARDS ET AL. *v.* SOUTH CAROLINA.

No. 86.   Argued December 13, 1962.—Decided February 25, 1963.

*Jack Greenberg* argued the cause for petitioners.   With him on the brief were *Constance Baker Motley, James M. Nabrit III, Matthew J. Perry, Lincoln C. Jenkins, Jr.* and *Donald James Sampson.*

*Daniel McLeod,* Attorney General of South Carolina, argued the cause for respondent.   With him on the brief were *J. C. Coleman, Jr.* and *Everett N. Brandon,* Assistant Attorneys General.

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioners, 187 in number, were convicted in a magistrate's court in Columbia, South Carolina, of the

common-law crime of breach of the peace. Their convictions were ultimately affirmed by the South Carolina Supreme Court, 239 S. C. 339, 123 S. E. 2d 247. We granted certiorari, 369 U. S. 870, to consider the claim that these convictions cannot be squared with the Fourteenth Amendment of the United States Constitution.

There was no substantial conflict in the trial evidence.[1] Late in the morning of March 2, 1961, the petitioners, high school and college students of the Negro race, met at the Zion Baptist Church in Columbia. From there, at about noon, they walked in separate groups of about 15 to the South Carolina State House grounds, an area of two city blocks open to the general public. Their purpose was "to submit a protest to the citizens of South Carolina, along with the Legislative Bodies of South Carolina, our feelings and our dissatisfaction with the present condition of discriminatory actions against Negroes, in general, and to let them know that we were dissatisfied and that we would like for the laws which prohibited Negro privileges in this State to be removed."

Already on the State House grounds when the petitioners arrived were 30 or more law enforcement officers, who had advance knowledge that the petitioners were coming.[2] Each group of petitioners entered the grounds through a driveway and parking area known in the record as the "horseshoe." As they entered, they were told by the law enforcement officials that "they had a right, as a citizen, to go through the State House grounds, as any other citizen has, as long as they were peaceful." Dur-

---

[1] The petitioners were tried in groups, at four separate trials. It was stipulated that the appeals be treated as one case.

[2] The Police Chief of Columbia testified that about 15 of his men were present, and that there were, in addition, "some State Highway Patrolmen; there were some South Carolina Law Enforcement officers present and I believe, I'm not positive, I believe there were about three Deputy Sheriffs."

ing the next half hour or 45 minutes, the petitioners, in the same small groups, walked single file or two abreast in an orderly way [3] through the grounds, each group carrying placards bearing such messages as "I am proud to be a Negro" and "Down with segregation."

During this time a crowd of some 200 to 300 onlookers had collected in the horseshoe area and on the adjacent sidewalks. There was no evidence to suggest that these onlookers were anything but curious, and no evidence at all of any threatening remarks, hostile gestures, or offensive language on the part of any member of the crowd. The City Manager testified that he recognized some of the onlookers, whom he did not identify, as "possible trouble makers," but his subsequent testimony made clear that nobody among the crowd actually caused or threatened any trouble.[4] There was no obstruction of pedes-

---

[3] The Police Chief of Columbia testified as follows:

"Q. Did you, Chief, walk around the State House Building with any of these persons?

"A. I did not. I stayed at the horseshoe. I placed men over the grounds.

"Q. Did any of your men make a report that any of these persons were disorderly in walking around the State House Grounds?

"A. They did not.

"Q. Under normal circumstances your men would report to you when you are at the scene?

"A. They should.

"Q. Is it reasonable to assume then that there was no disorderly conduct on the part of these persons, since you received no report from your officers?

"A. I would take that for granted, yes."

The City Manager testified:

"Q. Were the Negro college students or other students well demeaned? Were they well dressed and were they orderly?

"A. Yes, they were."

[4] "Q. Who were those persons?

"A. I can't tell you who they were. I can tell you they were present in the group. They were recognized as possible trouble makers.

trian or vehicular traffic within the State House grounds.[5] No vehicle was prevented from entering or leaving the horseshoe area. Although vehicular traffic at a nearby street intersection was slowed down somewhat, an officer was dispatched to keep traffic moving. There were a number of bystanders on the public sidewalks adjacent to the State House grounds, but they all moved on when asked to do so, and there was no impediment of pedestrian traffic.[6] Police protection at the scene was at all

"Q. Did you and your police chief do anything about placing those people under arrest?

"A. No, we had no occasion to place them under arrest.

"Q. Now, sir, you have stated that there were possible trouble makers and your whole testimony has been that, as City Manager, as supervisor of the City Police, your object is to preserve the peace and law and order?

"A. That's right.

"Q. Yet you took no official action against people who were present and possibly might have done some harm to these people?

"A. We took no official action because there was none to be taken. They were not creating a disturbance, those particular people were not at that time doing anything to make trouble but they could have been."

[5] The Police Chief of Columbia testified:

"Q. Each group of students walked along in column of twos?

"A. Sometimes two and I did see some in single-file.

"Q. There was ample room for other persons going in the same direction or the opposite direction to pass on the same sidewalk?

"A. I wouldn't say they were blocking the sidewalk; now, that was through the State House grounds."

[6] The Police Chief of Columbia testified:

"A. At times they blocked the sidewalk and we asked them to move over and they did.

"Q. They obeyed your commands on that?

"A. Yes.

"Q. So that nobody complained that he wanted to use the sidewalk and he could not do it?

"A. I didn't have any complaints on that."

times sufficient to meet any foreseeable possibility of disorder.[7]

In the situation and under the circumstances thus described, the police authorities advised the petitioners that they would be arrested if they did not disperse within 15 minutes.[8] Instead of dispersing, the petitioners engaged in what the City Manager described as "boisterous," "loud," and "flamboyant" conduct, which, as his later testimony made clear, consisted of listening to a "religious harangue" by one of their leaders, and loudly singing "The Star Spangled Banner" and other patriotic and religious songs, while stamping their feet and clapping their hands. After 15 minutes had passed, the police arrested the petitioners and marched them off to jail.[9]

---

[7] The City Manager testified:

"Q. You had ample time, didn't you, to get ample police protection, if you thought such was needed on the State House grounds, didn't you?

"A. Yes, we did.

"Q. So, if there were not ample police protection there, it was the fault of those persons in charge of the Police Department, wasn't it?

"A. There was ample police protection there."

[8] The City Manager testified:

"Q. Mr. McNayr, what action did you take?

"A. I instructed Dave Carter to tell each of these groups, to call them up and tell each of the groups and the group leaders that they must disperse, they must disperse in the manner which I have already described, that I would give them fifteen minutes from the time of my conversation with him to have them dispersed and, if they were not dispersed, I would direct my Chief of Police to place them under arrest."

[9] The City Manager testified:

"Q. You have already testified, Mr. McNayr, I believe, that you did order these students dispersed within fifteen minutes?

"A. Yes.

"Q. Did they disperse in accordance with your order?

"A. They did not.

Upon this evidence the state trial court convicted the petitioners of breach of the peace, and imposed sentences ranging from a $10 fine or five days in jail, to a $100 fine or 30 days in jail. In affirming the judgments, the Supreme Court of South Carolina said that under the law of that State the offense of breach of the peace "is not susceptible of exact definition," but that the "general definition of the offense" is as follows:

"In general terms, a breach of the peace is a violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence . . . , it includes any violation of any law enacted to preserve peace and good order. It may consist of an act of violence or an act likely to produce violence. It is not necessary that the peace be actually broken to lay the foundation for a prosecution for this offense. If what is done is unjustifiable and unlawful, tending with sufficient directness to break the peace, no more is required. Nor is actual personal violence an essential element in the offense. . . .

"By 'peace,' as used in the law in this connection, is meant the tranquility enjoyed by citizens of a municipality or community where good order reigns among its members, which is the natural right of all persons in political society." 239 S. C., at 343–344, 123 S. E. 2d, at 249.

The petitioners contend that there was a complete absence of any evidence of the commission of this offense, and that they were thus denied one of the most basic ele-

---

"Q. What then occurred?

"A. I then asked Chief of Police Campbell to direct his men to line up the students and march them or place them under arrest and march them to the City Jail and the County Jail.

"Q. They were placed under arrest?

"A. They were placed under arrest."

ments of due process of law. *Thompson* v. *Louisville,* 362 U. S. 199; see *Garner* v. *Louisiana,* 368 U. S. 157; *Taylor* v. *Louisiana,* 370 U. S. 154. Whatever the merits of this contention, we need not pass upon it in the present case. The state courts have held that the petitioners' conduct constituted breach of the peace under state law, and we may accept their decision as binding upon us to that extent. But it nevertheless remains our duty in a case such as this to make an independent examination of the whole record. *Blackburn* v. *Alabama,* 361 U. S. 199, 205, n. 5; *Pennekamp* v. *Florida,* 328 U. S. 331, 335; *Fiske* v. *Kansas,* 274 U. S. 380, 385–386. And it is clear to us that in arresting, convicting, and punishing the petitioners under the circumstances disclosed by this record, South Carolina infringed the petitioners' constitutionally protected rights of free speech, free assembly, and freedom to petition for redress of their grievances.

It has long been established that these First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the States. *Gitlow* v. *New York,* 268 U. S. 652; *Whitney* v. *California,* 274 U. S. 357; *Stromberg* v. *California,* 283 U. S. 359; *De Jonge* v. *Oregon,* 299 U. S. 353; *Cantwell* v. *Connecticut,* 310 U. S. 296. The circumstances in this case reflect an exercise of these basic constitutional rights in their most pristine and classic form. The petitioners felt aggrieved by laws of South Carolina which allegedly "prohibited Negro privileges in this State." They peaceably assembled at the site of the State Government [10] and there peaceably expressed their grievances "to the citizens of South Carolina, along with the Legislative Bodies of South Carolina."

---

[10] It was stipulated at trial "that the State House grounds are occupied by the Executive Branch of the South Carolina government, the Legislative Branch and the Judicial Branch, and that, during the period covered in the warrant in this matter, to wit: March the 2nd, the Legislature of South Carolina was in session."

Not until they were told by police officials that they must disperse on pain of arrest did they do more. Even then, they but sang patriotic and religious songs after one of their leaders had delivered a "religious harangue." There was no violence or threat of violence on their part, or on the part of any member of the crowd watching them. Police protection was "ample."

This, therefore, was a far cry from the situation in *Feiner* v. *New York,* 340 U. S. 315, where two policemen were faced with a crowd which was "pushing, shoving and milling around," *id.,* at 317, where at least one member of the crowd "threatened violence if the police did not act," *id.,* at 317, where "the crowd was pressing closer around petitioner and the officer," *id.,* at 318, and where "the speaker passes the bounds of argument or persuasion and undertakes incitement to riot." *Id.,* at 321. And the record is barren of any evidence of "fighting words." See *Chaplinsky* v. *New Hampshire,* 315 U. S. 568.

We do not review in this case criminal convictions resulting from the evenhanded application of a precise and narrowly drawn regulatory statute evincing a legislative judgment that certain specific conduct be limited or proscribed. If, for example, the petitioners had been convicted upon evidence that they had violated a law regulating traffic, or had disobeyed a law reasonably limiting the periods during which the State House grounds were open to the public, this would be a different case.[11]

---

[11] Section 1–417 of the 1952 Code of Laws of South Carolina (Cum. Supp. 1960) provides as follows:

"It shall be unlawful for any person:

"(1) Except State officers and employees and persons having lawful business in the buildings, to use any of the driveways, alleys or parking spaces upon any of the property of the State, bounded by Assembly, Gervais, Bull and Pendleton Streets in *Columbia* upon any regular weekday, Saturdays and holidays excepted, between the hours

See *Cantwell* v. *Connecticut,* 310 U. S. 296, 307–308; *Garner* v. *Louisiana,* 368 U. S. 157, 202 (concurring opinion). These petitioners were convicted of an offense so generalized as to be, in the words of the South Carolina Supreme Court, "not susceptible of exact definition." And they were convicted upon evidence which showed no more than that the opinions which they were peaceably expressing were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection.

The Fourteenth Amendment does not permit a State to make criminal the peaceful expression of unpopular views. "[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech . . . is . . . protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. . . . There is no room under our Constitution for a more re-

of 8:30 a. m. and 5:30 p. m., whenever the buildings are open for business; or

"(2) To park any vehicle except in the spaces and manner marked and designated by the State Budget and Control Board, in cooperation with the Highway Department, or to block or impede traffic through the alleys and driveways."

The petitioners were not charged with violating this statute, and the record contains no evidence whatever that any police official had this statute in mind when ordering the petitioners to disperse on pain of arrest, or indeed that a charge under this statute could have been sustained by what occurred.

strictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups." *Terminiello* v. *Chicago*, 337 U. S. 1, 4–5. As in the *Terminiello* case, the courts of South Carolina have defined a criminal offense so as to permit conviction of the petitioners if their speech "stirred people to anger, invited public dispute, or brought about a condition of unrest. A conviction resting on any of those grounds may not stand." *Id., at* 5.

As Chief Justice Hughes wrote in *Stromberg* v. *California*, "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system. A statute which upon its face, and as authoritatively construed, is so vague and indefinite as to permit the punishment of the fair use of this opportunity is repugnant to the guaranty of liberty contained in the Fourteenth Amendment. . . ." 283 U. S. 359, 369.

For these reasons we conclude that these criminal convictions cannot stand.

*Reversed.*

MR. JUSTICE CLARK, dissenting.

The convictions of the petitioners, Negro high school and college students, for breach of the peace under South Carolina law are accepted by the Court "as binding upon us to that extent" but are held violative of "petitioners' constitutionally protected rights of free speech, free assembly, and freedom to petition for redress of their grievances." Petitioners, of course, had a right to peaceable assembly, to espouse their cause and to petition, but in my view the manner in which they exercised those rights was by no means the passive demonstration which this Court relates; rather, as the City Manager of Columbia

testified, "a dangerous situation was really building up" which South Carolina's courts expressly found had created "an actual interference with traffic and an imminently threatened disturbance of the peace of the community." [1] Since the Court does not attack the state courts' findings and accepts the convictions as "binding" to the extent that the petitioners' conduct constituted a breach of the peace, it is difficult for me to understand its understatement of the facts and reversal of the convictions.

The priceless character of First Amendment freedoms cannot be gainsaid, but it does not follow that they are absolutes immune from necessary state action reasonably designed for the protection of society. See *Cantwell* v. *Connecticut,* 310 U. S. 296, 304 (1940); *Schneider* v. *State,* 308 U. S. 147, 160 (1939). For that reason it is our duty to consider the context in which the arrests here were made. Certainly the city officials would be constitutionally prohibited from refusing petitioners access to the State House grounds merely because they disagreed with their views. See *Niemotko* v. *Maryland,* 340 U. S. 268 (1951). But here South Carolina's courts have found: "There is no indication whatever in this case that the acts of the police officers were taken as a subterfuge or excuse for the suppression of the appellants' views and opinions." [2] It is undisputed that the city officials specifically granted petitioners permission to assemble, imposing only the requirement that they be "peaceful." Petitioners then gathered on the State House grounds, during a General Assembly session, in a large number of almost 200, marching and carrying placards with slogans

---

[1] Unreported order of the Richland County Court, July 10, 1961, on appeal from the Magistrate's Court of Columbia, South Carolina. The Supreme Court's affirmance of that order, 239 S. C. 339, 123 S. E. 2d 247, is now before us on writ of certiorari.

[2] *Supra,* note 1.

such as "Down with segregation" and "You may jail our bodies but not our souls." Some of them were singing.

The activity continued for approximately 45 minutes, during the busy noon-hour period, while a crowd of some 300 persons congregated in front of the State House and around the area directly in front of its entrance, known as the "horseshoe," which was used for vehicular as well as pedestrian ingress and egress. During this time there were no efforts made by the city officials to hinder the petitioners in their rights of free speech and assembly; rather, the police directed their efforts to the traffic problems resulting from petitioners' activities. It was only after the large crowd had gathered, among which the City Manager and Chief of Police recognized potential troublemakers, and which together with the students had become massed on and around the "horseshoe" so closely that vehicular and pedestrian traffic was materially impeded,[3]

---

[3] The City Manager testified as follows:

"Q. Now, with relation, Mr. McNayr, to the sidewalks around the horseshoe and the lane for vehicular traffic, how was the crowd distributed, with regard to those sidewalks and roadways?

"A. Well, the conditions varied from time to time, but at numerous times they were blocked almost completely with probably as many as thirty or forty persons, both on the sidewalks and in the street area. . . .

"Q. Did you observe the pedestrian traffic on the walkway?

"A. Yes, I did.

"Q. What was the condition there?

"A. The condition there was that it was extremely difficult for a pedestrian wanting to get through, to get through. Many of them took to the street area, even to get through the street area or the sidewalk."

The Chief of Police testified as follows:

"Q. Was the street blocked?

"A. We had to place a traffic man at the intersection of Gervais and Main to handle traffic and pedestrians.

"Q. Was a vehicular traffic lane blocked?

"A. It was, that was in the horseshoe."

that any action against the petitioners was taken. Then the City Manager, in what both the state intermediate and Supreme Court found to be the utmost good faith, decided that danger to peace and safety was imminent. Even at this juncture no orders were issued by the City Manager for the police to break up the crowd, now about 500 persons, and no arrests were made. Instead, he approached the recognized leader of the petitioners and requested him to tell the various groups of petitioners to disperse within 15 minutes, failing which they would be arrested. Even though the City Manager might have been honestly mistaken as to the imminence of danger, this was certainly a reasonable request by the city's top executive officer in an effort to avoid a public brawl. But the response of petitioners and their leader was defiance rather than cooperation. The leader immediately moved from group to group among the students, delivering a "harangue" which, according to testimony in the record, "aroused [them] to a fever pitch causing this boisterousness, this singing and stomping."

For the next 15 minutes the petitioners sang "I Shall Not Be Moved" and various religious songs, stamped their feet, clapped their hands, and conducted what the South Carolina Supreme Court found to be a "noisy demonstration in defiance of [the dispersal] orders." 239 S. C. 339, 345, 123 S. E. 2d 247, 250. Ultimately, the petitioners were arrested, as they apparently planned from the beginning, and convicted on evidence the sufficiency of which the Court does not challenge. The question thus seems to me whether a State is constitutionally prohibited from enforcing laws to prevent breach of the peace in a situation where city officials in good faith believe, and the record shows, that disorder and violence are imminent, merely because the activities constituting that breach contain claimed elements of constitutionally protected speech

and assembly. To me the answer under our cases is clearly in the negative.

Beginning, as did the South Carolina courts, with the premise that the petitioners were entitled to assemble and voice their dissatisfaction with segregation, the enlargement of constitutional protection for the conduct here is as fallacious as would be the conclusion that free speech necessarily includes the right to broadcast from a sound truck in the public streets. *Kovacs* v. *Cooper,* 336 U. S. 77 (1949). This Court said in *Thornhill* v. *Alabama,* 310 U. S. 88, 105 (1940), that "[t]he power and the duty of the State to take adequate steps to preserve the peace and to protect the privacy, the lives, and the property of its residents cannot be doubted." Significantly, in holding that the petitioner's picketing was constitutionally protected in that case the Court took pains to differentiate it from "picketing *en masse* or otherwise conducted which might occasion . . . imminent and aggravated danger . . . ." *Ibid.* Here the petitioners were permitted without hindrance to exercise their rights of free speech and assembly. Their arrests occurred only after a situation arose in which the law-enforcement officials on the scene considered that a dangerous disturbance was imminent.[4] The County Court found that "[t]he evi-

---

[4] The City Manager testified as follows:

"Q. Did you hear any singing, chanting or anything of that nature from the student group?

"A. Yes.

"Q. Describe that as best you can.

"A. With the harangues, which I have just described, witnessed frankly by everyone present and in this area, the students began answering back with shouts. They became boisterous. They stomped their feet. They sang in loud voices to the point where, again, in my judgment, a dangerous situation was really building up."

dence is clear that the officers were motivated solely by a proper concern for the preservation of order and the protection of the general welfare in the face of an actual interference with traffic and an imminently threatened disturbance of the peace of the community." [5] In affirming, the South Carolina Supreme Court said the action of the police was "reasonable and motivated solely by a proper concern for the preservation of order and prevention of further interference with traffic upon the public streets and sidewalks." 239 S. C., at 345, 123 S. E. 2d, at 249–250.

In *Cantwell* v. *Connecticut, supra,* at 308, this Court recognized that "[w]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious." And in *Feiner* v. *New York,* 340 U. S. 315 (1951), we upheld a conviction for breach of the peace in a situation no more dangerous than that found here. There the demonstration was conducted by only one person and the crowd was limited to approximately 80, as compared with the present lineup of some 200 demonstrators and 300 onlookers. There the petitioner was "endeavoring to arouse the Negro people against the whites, urging that they rise up in arms and fight for equal rights." *Id.,* at 317. Only one person—in a city having an entirely differ-

---

The Police Chief testified as follows:

"Q. Chief, you were questioned on cross examination at length about the appearance and orderliness of the student group. Were they orderly at all times?

"A. Not at the last.

"Q. Would you describe the activities at the last?

"A. As I have stated, they were singing and, also, when they were getting certain instructions, they were very loud and boisterous."

[5] *Supra,* note 1.

ent historical background—was exhorting adults. Here 200 youthful Negro demonstrators were being aroused to a "fever pitch" before a crowd of some 300 people who undoubtedly were hostile. Perhaps their speech was not so animated but in this setting their actions, their placards reading "You may jail our bodies but not our souls" and their chanting of "I Shall Not Be Moved," accompanied by stamping feet and clapping hands, created a much greater danger of riot and disorder. It is my belief that anyone conversant with the almost spontaneous combustion in some Southern communities in such a situation will agree that the City Manager's action may well have averted a major catastrophe.

The gravity of the danger here surely needs no further explication. The imminence of that danger has been emphasized at every stage of this proceeding, from the complaints charging that the demonstrations "tended directly to immediate violence" to the State Supreme Court's affirmance on the authority of *Feiner, supra*. This record, then, shows no steps backward from a standard of "clear and present danger." But to say that the police may not intervene until the riot has occurred is like keeping out the doctor until the patient dies. I cannot subscribe to such a doctrine. In the words of my Brother Frankfurter:

> "This Court has often emphasized that in the exercise of our authority over state court decisions the Due Process Clause must not be construed in an abstract and doctrinaire way by disregarding local conditions. . . . It is pertinent, therefore, to note that all members of the New York Court accepted the finding that Feiner was stopped not because the listeners or police officers disagreed with his views but because these officers were honestly concerned with preventing a breach of the peace. . . .

"As was said in *Hague* v. *C. I. O., supra,* uncontrolled official suppression of the speaker 'cannot be made a substitute for the duty to maintain order.' 307 U. S. at 516. Where conduct is within the allowable limits of free speech, the police are peace officers for the speaker as well as for his hearers. But the power effectively to preserve order cannot be displaced by giving a speaker complete immunity. Here, there were two police officers present for 20 minutes. They interfered only when they apprehended imminence of violence. It is not a constitutional principle that, in acting to preserve order, the police must proceed against the crowd, whatever its size and temper, and not against the [demonstrators]." 340 U. S., at 288–289 (concurring opinion in *Feiner* v. *New York* and other cases decided that day).

I would affirm the convictions.