[L.A. No. 31540. May 20, 1982.]

In re CHARLES S. STEVENS, a Judge of the Superior Court, on Censure.

## OPINION

**THE COURT.**—The Commission on Judicial Performance, following a hearing before it and a review of a report of special masters, objections to that report, and related documents, found, inter alia: Judge Charles S. Stevens has served as judge of the Superior Court, County of Santa Barbara, since April 30, 1971. During his current term in office, and during the six years prior thereto, Judge Stevens repeatedly and persistently used racial and ethnic epithets, and made racially stereotypical remarks to counsel and court personnel. Most of these remarks occurred

during in chambers conferences rather than in open court. The commission further recited that, according to most witnesses, Judge Stevens has at all times performed his judicial duties fairly and equitably, and free from actual bias against any person regardless of race, ethnicity or sex, and that his remarks were both inappropriate and in poor taste.

The commission concluded that Judge Stevens' conduct was "prejudicial to the administration of justice that brings the judicial office into disrepute" (Cal. Const., art. VI, § 18, subd. (c)), and recommended that he be censured.

Upon our review of the record we are satisfied that the foregoing conclusion of the commission is fully warranted and that the discipline recommended should be adopted. Accordingly, and by this order, Judge Stevens is hereby publicly censured.

**KAUS, J.,** Concurring.—In view of the dissent, the majority opinion's lack of specificity fails to do justice to the commission's recommendation which we adopt. Therefore I feel compelled to detail some of the facts on which it is based.

During an in-chambers discussion regarding a criminal case involving two black defendants and a white victim, Judge Stevens remarked to counsel that black persons have to learn how to live in their own neighborhoods and that it was "typical" of black persons to fight unfairly.

Judge Stevens, during his term in office, referred to black persons as "Jig, dark boy, colored boy, nigger, coon, Amos and Andy, and jungle bunny." With one exception, Judge Stevens did not use these terms in open court or with reference to a party, witness or attorney in a case before him. In 1974, in a probate case involving a controversy between black litigants regarding burial of a loved one, Judge Stevens stated in the presence of court personnel only, "let's get on with this Amos and Andy show." On another occasion, he privately referred to his court clerk as being "lazier than a coon."

During another in-chambers discussion, Judge Stevens stated to a public defender that "Filipinos can be good, hard-working people and that they are clean, unlike some black animals who come into contact with the court."

In connection with a child abuse proceeding involving an Hispanic defendant with a Spanish surname, Judge Stevens observed from his prior experience that (in effect) Spanish persons live by different standards than we do; that wife abuse is common and more acceptable for them; and that such abuse might explain defendant's conduct toward her child.

In a civil settlement conference, Judge Stevens referred to Attorney Gonzales as "acting like a Mexican jumping bean" after he changed his position on settlement.

During his term in office, Stevens used such terms as "cute little tamales," "Taco Bell," "spic," and "bean" when referring to persons with Hispanic surnames in conversations with court personnel.

It is beyond me how it can be argued that such behavior is not "conduct prejudicial to the administration of justice" simply because Judge Stevens otherwise performed his judicial duties "fairly and equitably." "[J]ustice should not only be done, but should manifestly and undoubtedly be seen to be done." (*Rex* v. *Sussex Justices* (1924) 1 K.B. 256, 259 (Lord Hewart).) The administration of justice is prejudiced by the public perception of racial bias, whether or not it is translated into the court's judgments and orders.

I am particularly puzzled by the dissent's reference to *Cohen* v. *California* (1971) 403 U.S. 15 [29 L.Ed.2d 284, 91 S.Ct. 1780]. The facts of that case are too well known to require repeating. Can it be seriously contended that Judge Stevens would not be subject to censure if—before performing his duties "fairly and equitably"—he took the bench wearing a robe on the back of which he proclaimed that as far as "coons" and "spics" are concerned, his feelings were precisely the same as Mr. Cohen's toward the draft.

Bird, C. J., Newman, J., Broussard, J., and Reynoso, J., concurred.

**MOSK, J.**—I dissent.

The Commission on Judicial Performance (Commission) found that Judge Stevens has at all times performed his judicial duties fairly and equitably, and free from actual bias against any person regardless of race, ethnicity or sex. That is where the matter should have ended. De-

spite that express finding, however, the Commission has elected to seek the judge's censure because of distaste for his colorful vocabulary. Thus, while the Commission finds no fault with the judge's *conduct*, it proposes to have him disciplined because of his *speech*. In my view this is impermissible.

I must admit that I am morally offended by racial epithets, whether uttered in a courtroom or in a locker room. But under the constitutional prohibition against curbing freedom of expression, I am not permitted to allow my sensibilities to govern the speech, however uncouth, of any other person. Nor does the Commission have such power; it is authorized to discipline a judge for "*conduct* prejudicial to the administration of justice" (Italics added) (Cal. Const., art. VI, § 18, subd. (c)), not for its *ipse dixit* concept of the propriety of his *speech*.

It has often been said that the constitutional right of free expression is a powerful medicine in a society as diverse as ours. But, as Justice Harlan wrote in *Cohen v. California* (1971) 403 U.S. 15 [29 L.Ed.2d 284, 91 S.Ct. 1780], the right is "designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests."

The majority, and particularly the gratuitously lurid concurring opinion, attempt to transmute off-the-bench speech into judicial conduct because of the offensive nature of the speech, which they understandably resent, as do I. The result reveals a lack of full appreciation of the First Amendment and of article I, section 2, subdivision (a) of the California Constitution. It is easy to protect the free speech rights of a Republican or a Democrat; the real test arises when a court must give the same constitutional guarantees to a communist, a Nazi, a Ku Klux Klansman, an anti-Semite or any other species of bigot, regardless of his station in life. One of the immutable prerogatives of American citizenship is the right to speak freely, including "the freedom to speak foolishly and without moderation" (*Baumgartner v. United States* (1944) 322 U.S. 665, 674 [88 L.Ed. 1525, 1531, 64 S.Ct. 1240]).

My colleagues have also forgotten the lessons of the civil rights tensions of the 1960s. During that period many a red-neck sheriff interpreted civil rights speeches—particularly in and around court houses—as impermissible conduct. The United States Supreme Court refused to dilute the First Amendment, regardless of how objectionable the expressions were to local authorities, and consistently maintained the distinction between speech and conduct. (See, e.g., *Gregory* v. *Chicago* (1969) 394 U.S. 111 [22 L.Ed.2d 134, 89 S.Ct. 946]; *Cox* v. *Louisiana* (1965) 379 U.S. 536 [13 L.Ed.2d 471, 85 S.Ct. 453]; *Edwards* v. *South Carolina* (1963) 372 U.S. 229 [9 L.Ed.2d 697, 83 S.Ct. 680].)

Yes, the freedom of expression often creates discord and tumult, and is not infrequently offensive to some, or many, or even a majority in our society. But, as Justice Douglas reminded us: "a medley of voices is essential. That is why the First Amendment is our most precious inheritance." (Douglas, Go East Young Man (1974) p. 470.) Justice Harlan noted again in *Cohen* that while the words used may be more distasteful than others of their genre, still "one man's vulgarity is another's lyric. Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves the matters of taste and style so largely to the individual."

Nevertheless the Commission on Judicial Performance is seeking to impose on Judge Stevens its self-determined standard of appropriate taste and style in language. In so doing it reveals an imperious disregard for constitutional guarantees. Unfortunately this is not the first time this agency has demonstrated disdain for constitutional limitations.

In 1979 the same Commission deliberately violated the state constitutional requirement of confidentiality in its proceedings (art. VI, § 18, subd. (f)) by holding public hearings of a mere investigative nature at a cost of more than a half million taxpayer dollars. (*Mosk* v. *Superior Court* (1979) 25 Cal.3d 474 [159 Cal.Rptr. 494, 601 P.2d 1030].) As recently as February of this year, the Commission considered material sent by a judge to a legislative committee, and while it found the "facts do not constitute grounds for proceeding," it issued a didactic press release on February 23, 1982, declaring that communications "although not improper or unethical in a disciplinary sense, when indulged in by judges, run the risk of appearing insensitive and lacking in discretion."

There can be no more clear indication that the Commission deems itself clothed with magisterial power to criticize any speech or writings of members of the judiciary that it unilaterally deems insensitive or indiscreet.

If the choice of the people of California is between an independent judiciary and self-assumed censorship of judges by a bureaucratic agency, I have not the slightest doubt that the people would deem it in their best interest to opt for an independent judiciary.

If the day comes—and in view of the majority opinion it may be here—when judges at any level are to be disciplined for their manner of expression, however primitive, then we no longer have an independent judiciary in California. Judges will inevitably become timid and stifled, even though the Constitutions of the United States and of California apply to all persons; nothing in their text suggests that judges are excluded from protection.

If any discipline is indicated under the facts of this case, it is the Commission on Judicial Performance which should be censured for its overreaching assumption of authority, not the judge whose judicial conduct has been found to be free of bias.

I would dismiss the proceedings.