889 So.2d 225 (2004)
In re Judge Timothy C. ELLENDER.
No. 2004-O-2123.
Supreme Court of Louisiana.
December 13, 2004.
*226 Office of Special Counsel, Steven R. Scheckman, Special counsel, Mary Frances *227 Whitney, Assistant Special Counsel, Counsel for Applicant.
McMahon & McCollam, William Stevens Bordelon, Philip J. McMahon, Houma, Counsel for Judge Timothy E. Ellender.
Nancy E. Rix., Commission Legal Counsel.
TRAYLOR, J.[*]
This matter comes before this Court on the recommendation of the Judiciary Commission of Louisiana ("Commission") that Judge Timothy C. Ellender of the Thirty-Second Judicial District Court, Parish of Terrebonne, State of Louisiana, be suspended from judicial office without pay for one year plus one day, and ordered to reimburse the Commission costs incurred in the investigation and prosecution of this case. The Commission conducted an investigatory hearing, issued findings of fact and conclusions of law, and determined that Judge Ellender violated La. Const. Art. V, § 25(C). Judge Ellender and the Commission stipulated that he violated Canons 1 and 2A of the Code of Judicial Conduct.

FACTS AND PROCEDURAL HISTORY
Judge Ellender assumed the office of judge of the Thirty-Second Judicial District Court for the Parish of Terrebonne on January 1, 1983. The facts that form the basis of the complaint are not disputed.
On October 31, 2003, Judge Ellender and his wife attended a Halloween party held at the 1921 Seafood Restaurant in Houma, which is owned by Mrs. Ellender's relative, Mr. Jody Martin. The party guests were the majority of persons in the restaurant that night, but there were five or six other persons who were also seated for dinner who were not party guests. The restaurant remained open to the public to purchase seafood for take out. Staff of the restaurant, including an African-American employee, were also present. Judge Ellender was dressed as a prisoner, wearing an orange prison jumpsuit and handcuffs he borrowed from the Sheriff of Terrebonne Parish, as well as a black afro wig. Mrs. Ellender was dressed as a police officer. Based on briefs filed by Judge Ellender, in choosing these costumes, it was his intent to be humorous by implying that Mrs. Ellender, who was newly married to him and who was reportedly young and attractive, had her husband under her control.
When Judge and Mrs. Ellender arrived at the party, their costumes did not generate the laughs they had expected. Judge Ellender remarked upon this, and Mr. Martin, offered the judge some black makeup to enhance his costume. Both Judge Ellender and Mrs. Ellender applied the black makeup to their faces. According to Judge Ellender's testimony before the Commission, after about an hour the wig was bothering him and he removed it and wiped the makeup off his face. He testified that he also took off the handcuffs and went to another restaurant.
On November 9, 2003, The Courier, a local newspaper in Houma, printed an article entitled "Local judge's masquerade sparks racial concerns." Local broadcast media picked up the news report about the judge's costume on November 10, 2003, followed by CNN on November 11 and two New Orleans television stations on November 19. The local office of the NAACP also received calls complaining about Judge Ellender's Halloween masquerading. *228 Between November 11 and 17, 2003, the Commission received six complaints about Judge Ellender's blackface masking on Halloween, including complaints filed by the NAACP and Judge Ellender's colleagues on the 32nd Judicial District Court bench.
After an investigation, the Commission filed formal charges against Judge Ellender. The Commission alleged that Judge Ellender lent the prestige of his judicial office to advance his own private interest in securing public property, namely the prison jumpsuit and handcuffs that he obtained from the Sheriff of Terrebonne Parish; that Judge Ellender's actions on Halloween were widely reported in the local and national news media, causing members of the public to view in a negative manner the judicial system in Houma, Terrebonne Parish, and throughout the State of Louisiana; and that by wearing a "blackface prisoner costume" in public on Halloween, Judge Ellender portrayed African-Americans in a racially stereotypical manner that perpetuated the notion of African-Americans as both inferior and as criminals, which conduct was offensive, derogatory, degrading, insulting, and demeaning towards African-Americans, and called into question Judge Ellender's integrity and his ability to be fair and impartial towards African-Americans who appear before his court as defendants in criminal proceedings, all in violation of Canons 1, 2 A, 2 B, 3 A(4), and 3C of the Code of Judicial Conduct. The Commission further alleged that Judge Ellender engaged in public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).
Prior to the hearing, on May 20, 2004, Judge Ellender and the Office of Special Counsel ("OSC") filed a "Statement of Stipulated Uncontested Material Facts and Stipulated Conclusions of Law." Judge Ellender admitted the essential underlying factual allegations of the Formal Charges. Specifically, Judge Ellender admitted that he wore, in public, a Halloween costume consisting of "blackface" makeup, an official orange prison jumpsuit, handcuffs, and an "afro" wig. Based on these stipulated facts, Judge Ellender and the OSC agreed that he violated Canons 1 and 2A of the Code of Judicial Conduct. However, Judge Ellender did not agree that by wearing such a costume he portrayed African-Americans in a racially stereotypical manner that perpetuated the notion of African-Americans as both inferior and as criminals, nor did he agree that he engaged in conduct that was offensive, derogatory, degrading, insulting, and demeaning towards African-Americans. Judge Ellender further refuted the allegation that he called into question his integrity or his ability to be fair and impartial towards African-Americans who appear before his court as defendants in criminal proceedings. Finally, Judge Ellender denied that his conduct constituted a violation of Canons 2B, 3A(4), or 3C of the Code of Judicial Conduct or La. Const. art. V, § 25(C).
On June 18, 2004, the Commission conducted a hearing on the Formal Charges. Judge Ellender testified on his own behalf and on cross-examination by the OSC, admitted that dressing up in a prison outfit with black makeup on his face was "offensive," "insensitive and wrong." He also agreed that he understood how "people could consider that very inflammatory." Judge Ellender pleaded "stupidity, ignorance and lack of judgment" in his choice of a Halloween costume, but denied that by dressing in this manner he perpetuated the notion of African-Americans as criminals. Finally, Judge Ellender apologized to "those of you who I ever offended" for his "lapse of judgment."
*229 In addition to the stipulated facts and conclusions of law,[1] on August 17, 2004, the Commission issued its findings of fact and legal conclusions. The Commission concluded that by wearing his "black face prisoner costume" in public on Halloween, Judge Ellender portrayed African-Americans in a racially stereotypical manner that perpetuated the notion of African-American men as both inferior and as criminals. The Commission also found that Judge Ellender's conduct called into question his ability to be fair and impartial towards African-Americans who appear before his court as defendants in criminal proceedings, as well as towards any African-American litigant or attorney in any proceeding before him, thereby creating the appearance of impropriety. The Commission determined that this was public conduct by Judge Ellender which was prejudicial to the administration of justice, in violation of La. Const. art. V, § 25(C). Finally, the Commission concluded that Judge Ellender's "tempest in a teapot" comment to a newspaper reporter belittled the seriousness of the Halloween costume incident, thereby aggravating the unethical appearance of impropriety, in violation of Canon 1 of the Code of Judicial Conduct. However, the Commission found that Judge Ellender did not violate Canon 2 B of the Code of Judicial Conduct, which prohibits a judge from lending the prestige of judicial office to advance his own private interest, because the unrebutted hearing testimony was to the effect that the sheriff loaned prison jumpsuits and handcuffs to anyone who asked for them. Furthermore, the Commission found no violation by Judge Ellender of Canon 3 A(4), which requires a judge to perform judicial duties without bias or prejudice. The Commission recommended Judge Ellender be suspended from judicial office without pay for one year plus one day, and ordered to reimburse the Commission costs incurred in the investigation and prosecution of this case.

JURISDICTION OF THE SUPREME COURT
This Court has original jurisdiction in judicial disciplinary proceedings. La. Const. art. V, § 25(C). Therefore, this Court has the power to make original determinations of fact based upon the evidence in the record and is not bound by, nor required to give any weight to, the findings and recommendations of the Judiciary Commission. In re Quirk, 97-1143 p. 4 (La.12/12/97), 705 So.2d 172, 176.
Pursuant to our supervisory authority over all lower courts, this Court adopted the Code of Judicial Conduct ("Code"), effective January 1, 1976, and amended July 8, 1996. The Code is binding on all judges, and violations of its Canons can, without more, serve as the basis for the disciplinary action provided for by La. Const. art. V, § 25(C). E.g., In re Jefferson, 99-1313, p. 3 (La.1/19/00), 753 So.2d 181, 184-85; In re Bowers, 98-1735, p. 7 (La.12/1/98), 721 So.2d 875, 879; In re Quirk, 97-1143, p. 4, 705 So.2d at 176. The Code consists of a series of canons which not only provide guidance and instruction but demand ethical conduct and the avoidance of unethical conduct or practices. *230 The Code is "binding on all judges," and judges are "governed exclusively by [its] provisions." In re Decuir, 95-0056, p. 8 (La.5/22/95), 654 So.2d 687, 692 and La. R.S. 42:1167. The legislative statement in La. R.S. 42:1167, codifies our jurisprudence which provides that judges are governed exclusively by the Code, and the Code is not contrary to the Constitution's exclusive grant of authority to this Court in the realm of judicial misconduct. In re: Lemoine, 96-2116 (La.1/14/97), 686 So.2d 837. Because the Code contains some general commands, for example Canon 1 ("A Judge Shall Uphold the Integrity and Independence of the Judiciary") and Canon 2 ("A Judge Shall Avoid Impropriety and the Appearance of Impropriety in All Activities"), it is apparent that the Code covers all misconduct as well, since misconduct offends, at the least, Canons 1 and 2. It is therefore safe to say, as the legislature did in 42:1167, that judges are governed exclusively by the Code's provisions, notwithstanding the self-evident fact that the Court has exclusive authority to punish misconduct, unlimited by the Code.
While this Court has the authority to punish misconduct for violation of the Canons, the charge or charges against a judge must nonetheless be proved by clear and convincing evidence before this Court can impose discipline. In re Bowers, 98-1735 at p. 7, 721 So.2d at 880; In re Johnson, 96-1866, p. 7 (La.11/25/96), 683 So.2d 1196, 1199; In re Huckaby, 95-0041, p. 6 (La.5/22/95), 656 So.2d 292, 296. This standard requires that the level of proof supporting the charge or charges against a judge must be more than a mere preponderance of the evidence, but less than beyond a reasonable doubt. In re Bowers, 98-1735 at p. 7, 721 So.2d at 880; In re Quirk, 97-1143 at p. 4, 705 So.2d at 176; In re Huckaby, 95-0041 at p. 6, 656 So.2d at 296. Initially, we note that Judge Ellender and the OSC stipulated to the underlying facts of the charge. The parties stipulated that Judge Ellender wore an afro wig, black face makeup and a prison jumpsuit while at a public party and that his actions violated Canons 1 and 2 A of the Code of Judicial Conduct.
In In re Johnson, 96-1866 at p. 4 (La.11/25/96), 683 So.2d 1196, 1200, we applied the clear and convincing standard of proof to a case where the judge and OSC entered into a stipulation of facts which was later adopted by the Judiciary Commission in its findings of fact and conclusions of law. There we stated:
Judge Johnson has admitted to all the facts necessary to determine whether he violated the Code of Judicial Conduct in the Statement of Uncontested Material Facts jointly submitted by all parties and accepted by the Commission ... Because Judge Johnson agreed to stipulations encapsulating the essence of ethical violations,... our inquiry as to Johnson's violations of these Canons is at an end. See Decuir, 95-0056 at p. 8, 654 So.2d at 692 (finding that because the parties stipulated to the relevant facts and the judge admitted that the facts establish violations of the Code of Judicial Conduct, the Court is "left only with the task of deciding the appropriate measure of discipline in this case.")
Applying this analysis to the present case, we find that since Judge Ellender stipulated to all the facts needed to determine his violation of the Code of Judicial Conduct, Canons 1 and 2 A, we pretermit addressing the remaining violations of Canons 2 B and 3(A)(4), and 3(C), as the Commission found no violation of these Canons. We therefore find that the underlying facts forming the basis of the Formal Charges relative to Canons 1 and 2 A, have been proven by clear and convincing evidence.

*231 DISCUSSION
Our judicial system stands as the hallmark of a system created to ensure that fairness and justice is dispensed to every citizen, without fear of bias or prejudice. In the instant case, Judge Ellender stipulated that he wore an official orange prison jumpsuit and a black "afro" wig to a public party. He admits his conduct violated Canons 1 and 2 A, which require a judge to uphold the integrity and independence of the judiciary and require that a judge shall respect and comply with the law. The actions of Judge Ellender resulted in several complaints being filed by a host of persons ranging from private citizens to Judge Ellender's fellow brethren of the 32nd Judicial District Court. Judge Ellender's actions were likewise widely reported in the news both locally and nationally. We find that Judge Ellender's conduct brought the judiciary of this state into disrepute, and for such conduct we are compelled to impose discipline.
Justice Francois-Xavier Martin, a great Chief Justice of Louisiana, quoted by Justice Poche in State ex rel. Attorney General v. Lazarus, 39 La.Ann. 142, 1 So. 361, 376 (1887), eloquently stated, "All those who minister in the temple of justice, from the highest to the lowest, should be above reproach and suspicion. None should serve at its altar whose conduct is at variance with his obligations." It is widely understood that judges symbolize the law, and, accordingly, their actions reflect favorably or unfavorably on the judicial system. In re Wimbish, 98-2882 at p. 6 (La.4/13/99), 733 So.2d 1183. As a public official, a judge's behavior both on and off the bench must comply with the highest of standards delineated in the Canons. When a judge's actions raise the concern Judge Ellender's behavior raises, we are required to thoroughly examine the conduct and the implications of such conduct, to ensure that the integrity of the state's judicial system is maintained.
Judges hold a unique position of administering justice. In re Wimbish, 733 So.2d 1183. For this reason, it is important that judges comply with the laws and rules governing their conduct in a manner which promotes public confidence. Id. Judges are held to a higher standard by virtue of their position and the authority they have over citizens and must avoid any action which would cause the citizens to question their integrity or the integrity of the bench. In his brief, and in his oral argument, Judge Ellender consistently states that he meant no ill will or harm by his costume. He submits that his costume was conceived in a joking manner to highlight his marriage to his "new and younger wife." Judge Ellender maintains that he sought to convey the perception that he was a prisoner to his new wife, not that he was an African-American convict. He vehemently denies that by wearing the costume he meant to portray African-Americans in a "racially stereotypical manner that perpetuated a notion that African-Americans are inferior and criminals." Judge Ellender admits that his behavior may have been perceived as "very inflammatory," for which he repeatedly apologizes. Accepting his statements as true, this Court is nonetheless greatly troubled by the negative light Judge Ellender's actions have cast on the state's judiciary. In determining an appropriate sanction, we are cognizant of the principle that the primary purpose of the Code is to protect the public rather than simply to discipline judges. In re Harris, 98-0570 (La.7/8/98), 713 So.2d 1138; In re Marullo, 96-2222 (La.4/8/97), 692 So.2d 1019. As ministers of justice charged with the duty to preserve the integrity of the bench for the benefit of the public, this State's judges should conduct themselves in a manner *232 above reproach and suspicion. State ex rel. Attorney General v. Lazarus, 1 So. at 376.

DISCUSSION OF JUDICIAL CANONS AND DISCIPLINE
As in all judicial discipline matters, the Judicial Canons are paramount and provide the benchmark against which judicial conduct is judged. In re Harris, 98-0570 at p. 3, 713 So.2d at 1141. Judge Ellender and the OSC stipulated that Judge Ellender violated Canons 1 and 2 A. Canon 1, entitled "A Judge Shall Uphold the Integrity and Independence of the Judiciary," provides:
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved.
Canon 2(A), entitled "A Judge Shall Avoid Impropriety and the Appearance of Impropriety in All Activities," provides:
A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
As Judge Ellender concedes violation of the Code, the sole remaining issue for this Court is the appropriate discipline for his violations of Canons 1 and 2 A. Hence, we are compelled to impose a sanction on Judge Ellender which will facilitate the public in regaining its confidence in the judiciary.
In In re Chaisson, 549 So.2d 259, 266 (La.1989), citing In Matter of Deming, 108 Wash.2d 82, 736 P.2d 639, 659 (1987), we adopted the following non-exclusive list of factors to consider in imposing discipline on a judge:
(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
Judge Ellender has remained continuously on the bench since 1983, and has never been disciplined, either privately or publicly, for judicial ethical misconduct. The conduct forming the basis of the complaints occurred outside of the courtroom in Judge Ellender's private life. However, we recognize that his actions have caused the public to question his integrity and ability to be fair to African-Americans and has diminished the integrity and respect citizens hold for Louisiana's judiciary.
In mitigation, we find no evidence presented that Judge Ellender engaged in disparate treatment of African-Americans and consider the totality of evidence presented to the Commission. A review of Judge Ellender's docket, conducted by the District Attorney's Office pursuant to a public records request, revealed no disparity in his sentencing of criminals based on race. Four African-Americans testified on Judge Ellender's behalf. These witnesses testified that Judge Ellender is a good judge and they consider him fair and impartial in carrying out his duties as a *233 judge. One witness even characterized his behavior on Halloween as "stupid," a characterization Judge Ellender himself concedes.
We agree with the mitigating evidence presented that Judge Ellender did not intend to offer an affront to the African-American community. Nonetheless, his behavior exhibits his failure to appreciate the effects of his actions on the community as a whole. So finding, we conclude that his discipline must also include a mechanism to enhance his understanding of the incident. We therefore order Judge Ellender to enroll in a course at one of the local universities which will allow him to gain insight into the attitude of other racial groups, particularly racial groups where interrelations are marked by antagonism, discrimination and conflict. This Court has reviewed the curriculum of several sociology departments at local universities, including but not limited to Nicholls State and Southeastern Louisiana University, and have found several courses addressing these issues. We hereby order Judge Ellender, with the facilitation by the OSC, to enroll and complete at least one of these courses.
Considering the mitigating circumstances, specifically that the act was isolated and that there was no ill intent on the part of Judge Ellender, in addition to the recommendation of course work above, we nonetheless find suspension from office is also appropriate. We conclude that Judge Ellender should be suspended for one year, without pay, and that six months of that suspension be deferred.[2] The discipline is subject to the condition outlined above that Judge Ellender attend a course which will assist him in achieving a greater understanding of racial sensitivity.

CONCLUSION
The negative shroud cast upon the state's judiciary by Judge Ellender's actions will only be lifted by time. This is a case of first impression in Louisiana and this court is mindful of the effects Judge Ellender's behavior has had on the people of this state, including Judge Ellender and his family. The witnesses who testified before the Commission stated that many in the Houma community have accepted Judge Ellender's apology and are moving forward. In imposing discipline, we seek to further that objective for Louisiana. Sanctions imposed in judicial disciplinary proceedings against judges from this court range from removal to a complete rejection of discipline. Hence, the discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass'n v. Whittington, 459 So.2d 520 (La.1984). Thus, in imposing discipline, we must remain mindful of the principle that this Court must protect *234 the public rather than simply discipline judges.
Considering the Chaisson factors, and taking into account the testimony, we conclude that the discipline outlined above is the appropriate sanction for Judge Ellender's actions.

DECREE
Upon review of the record, briefs, and oral argument, it is ordered that Judge Timothy Ellender, be suspended from his office of Judge, Thirty-Second Judicial District Court for the Parish of Terrebonne for a period of one year, without pay, with six months deferred. During his suspension, it is ordered that Judge Ellender complete the condition set forth in this opinion. Failure to adhere to the condition, may be grounds to revoke the deferred portion of the suspension. All costs and expenses, amounting to $2,136.70 (Two thousand, one hundred and thirty six and 70/100 dollars), are assessed against Judge Ellender in accordance with Supreme Court Rule XXIII, § 22.
VICTORY, J., and HIGHTOWER, J., ad hoc, dissented and assigned reasons.
LOMBARD, J., ad hoc., additionally concurred and assigned reasons.
VICTORY, J., dissenting.
I dissent from the majority opinion. As the majority notes, the primary purpose in imposing a sanction is to protect the public rather than simply to discipline judges. In re Harris, 98-0570 (La.07/08/98), 713 So.2d 1138; In re Marullo, 96-2222 (La.04/08/97), 692 So.2d 1019.
Traditionally, in lawyer-discipline cases, the Court looks to the guidelines from the American Bar Association for sanctions and deviates from those baseline sanctions based on aggravating or mitigating factors. No such guidelines exist to give baseline sanctions for judicial misconduct; however, In re Chaisson, 549 So.2d 259, 266 (La.1989) provides a somewhat similar process for determining the proper disciplinary sanction for judicial misconduct. Those factors are as follows:
(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
Obviously, these factors should decrease or exacerbate the sanction imposed on the offending judge.
In this case, nearly all of these factors favor mitigation of the sanction to be imposed. First, it is uncontested that this act was an isolated incident which occurred off the bench. In fact, Judge Ellender attended the party, not in any official capacity, but as a friend and relative of the host.
In regard to the judge's record of service, Judge Ellender served on the bench for 22 years prior to the incident at bar, and his record is unblemished. Furthermore, a review of Judge Ellender's record on the bench turned up absolutely no evidence of racial bias in his decisions; in fact, the review showed that, if anything, *235 he was more lenient toward African-American defendants. Nothing suggests that Judge Ellender abused his office in order to further personal desires.
Finally, Judge Ellender apologized for his actions both publicly and in private meetings with local leaders of the black community. The jurisprudence is clear that a recognition of misconduct and a willingness to aid in the investigation of such misconduct should act as a mitigating factor. See In re Ferrara, 458 Mich. 350, 582 N.W.2d 817 (1998). Here, Judge Ellender aided the Judiciary Commission and acknowledged his actions from the outset.
Bearing in mind all these mitigating factors, it remains to determine a baseline sanction from which to deviate. Since no jurisprudence involving similar misconduct exists in Louisiana, one must examine cases in other jurisdictions in order to distill a proper sanction. In re Stevens, 31 Cal.3d 403, 645 P.2d 99, 183 Cal.Rptr. 48 (1982), involved a judge who made patently racist and extremely offensive remarks to counsel and court personnel during in-camera conferences. Furthermore, the judge referred to his own court clerk in offensive, racist terms, and used a panoply of racial epithets to refer to people with Hispanic surnames.[1] While the California Supreme Court found that the judge's actions were "prejudicial to the administration of justice" and "[brought] the judicial office into disrepute," the Court found that the judge had always performed his judicial duties fairly and without actual bias. In spite of this egregious and highly offensive conduct, which far exceeded Judge Ellender's behavior, the Court imposed only a public censure, rather than a suspension or a removal from office. In re Lowery, 999 S.W.2d 639, 661 (Review Tribunal, Appointed by the Texas Supreme Court Feb. 13, 1998) involved several incidents of misconduct on the part of a Dallas County judge. In a particular incident, the offender identified himself as a judge and sought unmerited parking privileges, but the African-American parking attendant refused to accommodate the judge. The judge then referred to the parking lot attendant as "n* * * *r" and/or "black mother f* * *er." In assessing the judge's conduct, the Court noted that the verbal abuse and racial slurs were "serious misconduct" but "standing alone might justify a reprimand or censure." Finally, In re Agresta, 64 N.Y.2d 327, 476 N.E.2d 285, 486 N.Y.S.2d 886 (1985) involved a judge's comments to two African-American defendants at a sentencing hearing. Expressing his belief that one of the defendants was lying about the acts of a third party, the judge stated, "I know there is another n* * * *r in the woodpile. I want that person out." The court accepted the judge's claim that he had not intended the expression as a racial slur, but nonetheless found the phrase to be offensive and derogatory, and imposed a public censure upon the offending judge.
Considering the cases above and all of the factors favoring leniency toward Judge Ellender, I find the sanction imposed by the majority, which amounts to a loss of income of over fifty thousand dollars ($50,000), to be unduly harsh and would impose a lesser sanction.
LEMMIE O. HIGHTOWER, J., Ad Hoc (Assigned), dissenting.
I respectfully dissent from the penalty for those reasons assigned by Justice Victory, and essentially would impose less severe sanctions than the majority.
EDWIN A. LOMBARD, J., Ad Hoc. (Assigned), Concurring.
The state constitution mandates that judges not engage in conduct that brings *236 the judicial office in disrepute. Those who would write off Judge Ellender's lapse in judgment as a harmless prank requiring only a token sanction do not understand how deeply such an act resonates throughout the African-American community as a harsh reminder of a not too distant past. I believe, however, that educating a sitting judge as to the reality of racial injustice and insensitivity in our daily lives will have more far-reaching consequences than simply removing him. Requiring Judge Ellender to undergo racial sensitivity training sends the message not only to Judge Ellender but to the rest of the country that racial slurs and stereotyping, whether intentional or merely thoughtless, will no longer be tolerated in Louisiana. Incorporation of such training for all judges in Louisiana  white or black  into our continuing legal education could be beneficial in preventing similar infractions of the judicial code of conduct and promoting the impartial administration of justice to all our citizens. Accordingly, I support the sanction crafted by the majority.
NOTES
[*] Judge Edwin A. Lombard assigned as Justice ad hoc, sitting in the place of Associate Justice Bernette J. Johnson, recused. Retired Judge Lemmie O. Hightower, assigned as Justice ad hoc, sitting in the place of Associate Justice John L. Weimer, recused.
[1] Prior to the hearing, the parties stipulated to the introduction of exhibits concerning the subject matter at hand, including transcripts from news programs aired on CNN, videotapes from local television broadcasts, articles and editorials from local and national newspapers, and letters to the editors of several local newspapers. The parties also stipulated to the introduction of a resolution of the Louisiana State House of Representatives relative to Judge Ellender and two e-mail letters in support of Judge Ellender sent to this court's public information officer.
[2] In its recommendation to this Court, the Commission recommended Judge Ellender be suspended from office for one year and one day, without pay. During oral argument, Justice Kimball questioned counsel for OSC about the effect the "one day" had on the recommended discipline in this judicial discipline case. OSC responded that he was not aware of the reasoning surrounding the recommendation of an additional one day. He acknowledged that the rules applying to lawyer suspension were not applicable to this matter and that a suspension of one year and one day has additional consequences only in lawyer disciplinary cases. We note that the consequences of a suspension of one year and one day in a lawyer discipline case requires the suspended lawyer to petition this Court for reinstatement of his/her license. This Court must specifically approve the lawyers' reinstatement. See Supreme Court Rule 19, § 24. There is no such requirement for judicial discipline.
[1] For the exact language used, see 183 Cal.Rptr. 48, 645 P.2d at 99-100.